H. E. BONITZ v. BOARD OF TRUSTEES OF AHOSKIE SCHOOL DISTRICT, No. 11.

(Filed 22 March, 1911.)

1. **Schools—Races—Discrimination—Constitutional Law—Provisions Mandatory.**

    The constitutional provisions for a uniform system of public schools, and that the children of the white and colored races shall be taught in separate schools without "discrimination in favor of or to the prejudice of either race," are mandatory, and may be disregarded neither by legislatures nor officials charged with the duty of administering a given law. Constitution of N. C., Art. XIV, sec. 2.

BONITZ *v.* SCHOOL TRUSTEES.

2. **Same.**

An act of the Legislature designating a certain boundary "as a school district for the white race," requiring by construction that the funds to be raised under its provisions shall exclusively apply to the white schools within its boundary and the additional facilities afforded shall only be enjoyed by the white children attending the schools, is unconstitutional. Constitution of N. C., Art. XIV, sec. 2.

3. **Legislative Acts—Courts—Interpretation—Constitutional Law.**

Courts will not adjudge an act of the Legislature invalid unless its violation of the Constitution is, in their judgment, clear, complete, and unmistakable.

4. **Same.**

Between two permissible interpretations of a statute with reference to the Constitution, the one should always be adopted which upholds the law.

5. **Same—Schools—Taxation—Bond Issues—Races—Discrimination.**

When a legislative enactment clearly indicates that its controlling purpose and, in several places, its expressed intent is to establish a special taxing district for the purpose, by an increase of taxation and an issue of bonds, of affording additional school facilities within the prescribed district, the beneficent purpose of the act will not be frustrated because, in one of the sections, it is designated as a "school district for the white race."

6. **Same—Application of Funds.**

Chapter 210, Laws 1909, entitled an act to incorporate a certain school district and allow it to vote on a special tax for schools and to issue bonds, in the body of the act clearly defined the boundaries of the district, provided for taking a vote upon the questions of special taxation and the issuance of the bonds and for the application of the moneys derived to the building and equipping of suitable buildings, and "for such other purposes as the trustees may order"; also, that the amounts coming from the special tax shall be paid by the proper officers to the board of trustees, to be by them used "for the benefit of the public schools of the district." The questions of taxation and bonds were duly acted on and approved by the people of the district: *Held*, (1) a designation in one of the sections of the act that the district was "for the white race" should be disregarded, and the constitutionality of the act upheld; (2) upon the facts in this case there is nothing to show that the proceeds of the bond issue, or the portion involved, may not be applied as directed by the act. *Lowery v. School Committee,* 140 N. C., 33, and *Smith v. School Trustees,* 141 N. C., 143, cited and approved.

APPEAL from HERTFORD, heard on case agreed, by consent, before *J. S. Adams, J.,* 13 February, 1911, at Warrenton.

The facts stated in the case on appeal are as follows:

1. The General Assembly of North Carolina at its session of 1909 passed an act entitled "An act to incorporate Ahoskie School District and allow it to vote on a special tax for schools and issue bonds," which is chapter 210 of the Private Laws of 1909.

2. That on 4 May, 1909, an election was held in said school district as provided for in said act, and the question "For School Tax" and "Against School Tax" was submitted to the qualified voters of said school district, as directed by said act, and at said election a majority of the qualified voters of said district voted "For School Tax." The result of said election was duly declared as directed by the provisions of said act.

3. That at said election the question of issuing bonds under the provisions of said act was also submitted to the qualified voters of Ahoskie Graded-school District.

4. That said election was held and conducted as provided for in said act, and a majority of the qualified voters of said district voted ballots with the word "Approved" written or printed thereon.

5. That the result of said election was declared and certified as required by said act.

6. That thereafter the bonds of said district were duly issued and executed, as provided for in said act, to the amount of $8,000, and are now under the control of said board of trustees.

7. That on .. day of June, 1910, said board of trustees contracted with said H. E. Bonitz to construct and build in said school district at Ahoskie a graded-school building at a cost of about $8,000, for which said Bonitz agreed to accept in part payment a portion of said bonds, provided they were valid and binding.

8. That said Bonitz has nearly completed said building, and is demanding of said trustees payment for his said work, but declines to accept any of said bonds, as he is advised and believes that they are not valid and binding, for the reason that said act is unconstitutional and void, but that he is willing to

accept a portion of said bonds in part payment of his said work, provided the court decides that said act is constitutional and said bonds are valid and binding.

9. The defendants are ready, willing, and able to deliver to plaintiff $4,000 of said bonds in part payment of his said work under their contract.

10. That none of the admissions herein contained are in any wise to affect either party or to be regarded as made except for the purpose of this submission of this controversy.

11. The questions submitted to the court upon this case are as follows:

First. Is said act, chapter 210 of the Private Laws of 1909, constitutional?

Second. Are said bonds issued under said act, as therein directed, valid and binding?

If said questions are answered in the affirmative, then judgment shall be rendered that said bonds are valid and binding, and that the plaintiff is compelled to accept a portion of said bonds in part payment of his contract price for erecting said school building when tendered by said board of trustees. If answered in the negative, then judgment is to be rendered that the plaintiff is not bound to accept any part of said bonds in payment of his contract.

On these facts, the court, being of opinion that the act was unconstitutional and the bonds were void, gave judgment for plaintiff, and defendant excepted and appealed.

*F. W. Bonitz for plaintiff.*
*Winborne & Winborne for defendant.*

HOKE, J. The Constitution of this State, Art. IX, sec. 2, in providing for a "uniform system of public schools wherein tuition shall be free of charge to all the children of the State between the ages of 6 and 21 years," contains the requirement, "That the children of the white race and the children of the colored race shall be taught in separate schools," and further, "but there shall be no discrimination in favor of or to the prejudice of either race." In numerous and well-considered de-

cisions this Court has held that these provisions of our Constitution, in regard to the two races, are mandatory, and may be disregarded neither by legislatures nor by officials charged·with the duty of administering a given law: *Smith v. School Trustees,* 141 N. C., pp. 143-159; *Lowery v. School Trustees,* 140 N. C., 33; *Puitt v. Comrs.,* 94 N. C., 709; *Riggsbee v. Durham,* 94 N. C., 800. If, therefore, the act in question here, in designating a certain boundary as a "school district for the white race," can only be construed as requiring that the funds to be raised under its provisions should be applied exclusively to the white schools within such boundary and the additional facilities afforded only enjoyed by the white children attending such schools, it would be clearly unconstitutional; but, in our opinion, such is not the necessary nor proper construction of the act. It is a well-recognized principle of statutory construction that "A court will not adjudge an act of the Legislature invalid unless its violation of the Constitution is, in their judgment, clear, complete, and unmistakable." Black Court Law, p. 61. And that as between two permissible interpretations, that should always be adopted which will uphold the law. "That construction of a statute should be adopted which, without doing violence to the fair meaning of the words used, brings it into harmony with the Constitution." *Grenada County Supervisors v. Brogden,* 112 U. S., 261. In Black on Interpretation of Laws, p. 93, it is said: "Every act of the Legislature is presumed to be valid and constitutional until the contrary is shown. All doubts are resolved in favor of the validity of the act. If it is fairly and reasonably open to more than one construction, that construction will be adopted which will reconcile the statute with the Constitution and avoid the consequence of unconstitutionality." And again, in same work, pp. 93 and 94: "Hence it follows that the courts will not so construe the law as to make it conflict with the Constitution, but will rather put such an interpretation upon it as will avoid conflict with the Constitution and give it full force and effect, if this can be done without extravagance. If there is doubt or uncertainty as to the meaning of the Legislature, if the words or provisions of the statute are obscure or if the enactment is fairly susceptible

of two or more constructions, that interpretation will be adopted which will avoid the effect of unconstitutionality, even though it may be necessary, for this purpose, to disregard the more usual or apparent import of the language employed." These principles were fully approved and applied in *Lowery's case, supra,* in which an act to establish a graded school for the town of Kernersville was upheld and the officials required to afford equal facilities thereunder for both races, though in several features of the act indication was given that only white children were to be provided for; these last being rejected because in conflict with the constitutional provision, and the officials were directed to organize and administer the school in accordance with the valid portions of the law. In that case and on the question we are now discussing, it was held as follows:

"9. In executing the law, the defendants shall not discriminate against either race, but shall afford to each equal facilities. It is not intended by this that the taxes are to be apportioned between the races per capita, but that the school term shall be of the same length during the school year, and that a sufficient number of competent teachers shall be employed at such prices as the board may deem proper. *Dictum* in *Hooker v. Greenville,* 130 N. C., 473, disapproved.

"10. If the defendant board or its successor shall refuse to establish and maintain the school upon a constitutional basis and in accordance with the constitutional provisions, the courts have power, by the writ of mandamus, to compel them to do so.

"11. The two essential principles underlying the establishment and maintenance of the public school system of this State are: First, the two races must be taught in separate schools, and, second, there must be no discrimination for or against either race. Keeping them in view, the matter of administration is left to the Legislature and the various officers, boards, etc., appointed for that purpose."

The act before us (chapter 210, Laws 1909) is entitled "An act to incorporate the Ahoskie School District and allow it to vote on a special tax for schools and to issue bonds," and in the body of the act it is designated as "Ahoskie School District,

BONITZ *v.* SCHOOL TRUSTEES.

No. 11." Then follows a description of the district by clearly defined boundaries, designating it as "a school district for the white race." Elaborate and specific provisions are then made for taking a vote of the district on the question of a special tax, and a separate and distinct provision for taking the sense of the voters as to the issue of bonds. Both of these provisions have been acted on, the tax voted and the bond issue approved. Section 9 provides, "That the money arising from the sale of bonds shall be used for purchasing a site and erecting suitable buildings and in furnishing necessary equipment for a graded school in such district," . . . "and for such other school purposes as the trustees may order." Sections 3 and 15 provide, "That all public school funds derived from the State and county, together with the amounts coming from the special tax above provided for, shall be, by the proper officers, paid to the board of trustees as herein provided for, and shall by them be used for the benefit of the *schools of said district.*" A perusal of the act gives clear indication that its controlling purpose and, in several places, its expressed intent is to establish a special taxing district for the purpose, by an increase of taxation and issue of bonds, of affording additional educational facilities within the prescribed district, legislation directly approved and sustained in *Smith v. Trustees,* 141 N. C., *supra,* and in *Perry v. Comrs.,* 148 N. C., 521, and this beneficent purpose should not be frustrated because, in one of the sections, it is designated as a "school district for the white race." In view of the authorities cited and the principles upon which they rest, the correct construction of the statute is to uphold it in its principal purpose and declare, as we do, that, disregarding this special feature of the act, contrary, as it is, to our Constitution, the money raised by taxation and by the issue and sale of bonds shall constitute a fund applicable to the school work of the district, to be administered according to law and having full regard to the constitutional provisions bearing upon it. Speaking to this question, the proper administration of a school fund, in *Smith v. School Trustees, supra,* the Court, after quoting with approval from *Lowery's case, supra,* said: "And from

this it follows that the discretion conferred upon the defendants by the terms of section 12 is by no means an arbitrary one, but the same must be used as directed and required by the Constitution and in the light of the above decision. There are no facts or data given by which the Court may determine whether the contemplated expenditure is or is not an unequal and unlawful disbursement of the school funds. The defendants in their sworn answer aver that they have no desire or intent but to administer their trust in accordance with the law of the land, and it is right that we should act upon this statement till the contrary is made to appear by proceedings duly entered. . . . If defendants, contrary to their avowed purpose, shall endeavor to exercise the authority conferred upon them with 'an evil eye and unequal hand' so as to practically make unjust discrimination between the races in the school facilities afforded, it is open to the parties who may be interested in the question, by proper action, to correct the abuse and enforce compliance with the law." The proper application of this fund, however, is not now before us, except to say that, so far as the facts now appear, there is nothing to show that the proceeds of the bond issue, or in any event the portion thereof involved in this suit, may not be applied as directed by the act. The only question presented on this appeal is on the validity of the bonds, and, being of opinion, for the reason stated, that the proposed issue is lawful, we hold that the plaintiff is not justified in refusing to accept the bonds, and that on the case agreed judgment should be entered for the defendant.

Reversed.