W. M. PERSON ET AL. v. R. A. DOUGHTON, COMMISSIONER OF REVENUE.

(Filed 20 December, 1923.)

1. Taxation—Mandamus—Corporations—Shares of Stock — Pleadings — Demurrer—Courts—Jurisdiction—Commissioner of Revenue.

On this appeal from sustaining a demurrer of the Superior Court for a writ of *mandamus* to compel the State Commissioner of Revenue to have listed for taxation as personal property shares of stock in foreign corporations held by resident stockholders, in this case *it is held* that the opinion in *Person v. Watts*, 184 N. C., 499, controls, and that the complaint failed to state facts sufficient to constitute a cause of action, and that the court had no authority or jurisdiction to grant the relief demanded.

2. Same—Constitutional Law.

The provisions of section 4, Revenue Act of 1923, excepting from taxation shares of stock held in this State when the situs of the corporation is in another State where it has its principal place of business and conducts the same, are not, in contravention of Article V, section 3, of the State Constitution: *Held further*, the remedy by *mandamus* is not ordinarily applicable when the constitutionality of a statute is involved in the controversy.

CLARK, C. J., dissenting.

APPEAL by plaintiffs from *Cranmer, J.,* at chambers in Raleigh, 20 June, 1923. From WAKE.

Application for writ of *mandamus,* heard upon demurrer, and from a judgment sustaining the demurrer, plaintiffs appeal.

*W. M. Person for plaintiffs.*
*Attorney-General Manning and Assistant Attorney-General Nash for defendant.*

STACY, J. In this action or proceeding, plaintiffs make application for a writ of *mandamus* to compel the defendant, Commissioner of Revenue of North Carolina, by order of court, to have listed for taxation, as personal property of the respective holders thereof, all shares of stock in foreign corporations held by individual shareholders and residents of this State. A demurrer was interposed in the trial court and sustained upon the ground (1) that the complaint, or petition, failed to state facts sufficient to constitute a cause of action, and (2) that the court had no jurisdiction or authority to grant the relief demanded. The appeal presents for review the correctness of the judgment sustaining the demurrer. We held in *Person v. Watts,* 184 N. C., 499—a case exactly parallel with the one at bar, so far as the right to a writ of *mandamus* is concerned—that the plaintiff there had not only applied for the wrong remedy, but had also selected the wrong forum. The same dual error has been repeated here.

It is the position of the plaintiffs that, under Article V, section 3, of the Constitution, the Legislature is required to pass laws "taxing, by a uniform rule, all moneys, credits, investments in bonds, stocks, joint-stock companies, or otherwise; and, also, all real and personal property, according to its true value in money"; and that this section has been violated by the following so-called "exemption clause" in section 4 of the Revenue Act of 1923: "Nor shall any individual stockholder of any foreign corporation be required to list or pay taxes on any share of its capital stock in this State, and the *situs* of such shares of stock in foreign corporations, owned by residents of this State, for the purposes of this act, is hereby declared to be at the place where said corporation undertakes and carries on its principal business." Wherefore plaintiffs pray that this clause in the Revenue Act of 1923 be declared null and void and that the defendant be required, by judicial decree, to have listed for taxation, as personal property of the respective holders thereof, all such stock in foreign corporations held by individual stockholders and residents of this State.

Even if the above clause in the Revenue Act of 1923 be unconstitutional—which it does not seem to be, though the question is not before us for decision—still the plaintiffs would not be entitled to the relief demanded, for the judiciary is without power to levy assessments or to devise a scheme of taxation. *Fert. Co. v. McFall,* 128 Tenn., 645. This is a legislative and not a judicial function.

*Mandamus* lies only to compel a party to do that which it is his duty to do without it. It confers no new authority. The party seeking the writ must have a clear legal right to demand it, and the party to be coerced must be under a legal obligation to perform the act sought to be enforced. *Missouri v. Murphy,* 170 U. S., 78; *Withers v. Comrs.,* 163 N. C., 341; *Edgerton v. Kirby,* 156 N. C., 347; *Betts v. Raleigh,* 142 N. C., 229. As to when the writ will issue generally, see note to *M'Cluny v. Silliman,* 4 L. Ed., 263.

It is rarely, if ever, proper to award a *mandamus* where it can be done only by declaring an act of the Legislature unconstitutional. *People v. San Francisco,* 20 Cal., 591; *Wright v. Kelley,* 4 Ia., 624; *People v. Stephens,* 2 Abb. Pr. N. S. (N. Y.), 348. In *S. v. Douglas Co.,* 18 Neb., 506, this position is stated as follows: "On an application for a *mandamus* against the county commissioners of Douglas County to compel them to call an election in the city of Omaha for twelve justices of the peace therein, there being six precincts, and alleging that an act reducing the number of justices in said city to three was unconstitutional and void: *Held,* that the Court would not in that proceeding determine whether or not the act was in contravention of the Constitution."

The presumption is that the Legislature has done its duty and that an act passed by it is not in conflict with the Constitution. It is incumbent upon all ministerial officers to obey the law, not to disregard it.

The courts have no direct supervisory power over the Legislature. The two are separate and distinct, though coördinate branches of the same government. The Constitution may contain provisions intended to guide and to control the course of legislation, but the courts will not undertake to enjoin or to prevent the enactment of unconstitutional laws, nor will they direct what laws shall be enacted. They may only render them harmless in individual cases, when properly presented. It is not the function of the courts to change or to repeal statutes. Their duties are judicial. They pass upon the rights of litigants, and in doing so may declare an act of the Legislature valid or invalid, when directly and necessarily involved, but this is as far as they go in dealing with legislation. If the law-making body has failed to obey the constitutional mandates, the remedy is with the people, by electing other servants, and not through the courts.

The courts never anticipate a question of constitutional law in advance of the necessity of deciding it; and they never formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied. *Liverpool, etc. Steamship Co. v. Comrs. of Immigration,* 113 U. S., p. 39; 28 L. Ed., p. 900; *Comrs. v. State Treasurer,* 174 N. C., p. 148; *Mass. v. Mellon,* 43 S. C. R., 597.

Again, the courts will not adjudge legislative acts invalid unless their violation of the Constitution be clear, complete and unmistakable. *Bonitz v. School Trustees,* 154 N. C., 379; *Coble v. Comrs.,* 184 N. C., p. 348. Speaking to this question in a recent case, *Adkins v. Children's Hospital,* 67 L. Ed., 440, the United States Supreme Court said: "The judicial duty of passing upon the constitutionality of an act of Congress is one of great gravity and delicacy. The statute here in question has successfully borne the scrutiny of the legislative branch of the Government, which, by enacting it, has affirmed its validity; and that determination must be given great weight. This Court, by an unbroken line of decisions from *Chief Justice Marshall* to the present day, has steadily adhered to the rule that every possible presumption is in favor of the validity of an act of Congress until overcome beyond rational doubt."

But we pursue the matter no further, as the constitutionality of the above clause in section 4 of the Revenue Act of 1923 is not now before us for decision. The application for writ of *mandamus* in the instant case was properly denied.

Affirmed.

Clark, C. J., dissenting: The Constitution of North Carolina, Art. V, sec. 3, is the Magna Carta in its guarantee of *equality* and *uniformity* in taxation to protect the weaker and less influential part of our people from being oppressed by over-taxation, forbidding discrimination in the laying of taxes, or by exempting the property of the wealthy and influential from their share of taxation, and thereby increasing the taxation upon those who are less able to protect themselves from such inequality.

This section provides in unmistakable language, which can be construed by any one as clearly and intelligently, and doubtless more correctly, than by merely technical lawyers who sometimes construe constitutions and legislation in the light most favorable to their clients.

This section is thus plainly expressed in Constitution, *Art. V, sec. 3*— *"Taxes Shall be by Uniform Rule and Ad Valorem: Laws shall be passed taxing, by uniform rule, all moneys, credits, investments in bonds, stocks, joint-stock companies or otherwise; and, also, all real and personal property according to its true value in money."*

The authority, which has been held to reside in the courts (beginning with *Marbury v. Madison, by Chief Justice Marshall*), to set aside acts as unconstitutional, is based upon the fundamental idea that when the act of a Legislature is in conflict with, or impinges upon any provision in the Constitution, such act is *no law*. Therefore it is exactly as if the act in question was not on the statute book at all, and the Constitution is unchanged by the attempted legislation. Upon this basis, therefore, the act which is impeached by the plaintiffs in this proceeding is a nullity. It stands as if it had never been enacted. It was not upon the statute book in any form in 1921, and, in contemplation of the Constitution, it is not there now.

All *"investments in stocks"* are necessarily made by those who buy them, and, under this rule of uniformity so clearly and unmistakably prescribed by the Constitution, such investments should bear exactly the same rate of taxation that is imposed upon all other tangible property which is required to be taxed "by uniform rule (as the Constitution expresses it)—all moneys, credits, investments in bonds, stocks, joint-stock companies or otherwise; and, also, all real and personal property, according to its true value in money." This clearly requires that $1,000 "invested in stocks" shall pay the same tax as the same sum if invested in livestock or land or in any other property whatsoever.

The statute now in question, exempting from taxation foreign stocks owned in this State, is therefore a nullity. In constitutional contemplation it does not exist, and it is the duty of the Commissioner of Revenue to have such property listed and taxes collected thereon as the

law existed in 1921, prior to this act attempting to exempt it from all taxation. If he does not do so, necessarily it deprives the State of the revenue which was collected upon foreign stocks until this act of 1923 was enacted. Such exemption increases the burden of taxation upon all other property notwithstanding the express provision of the Constitution that *all* property shall be taxed *ad valorem* and by uniform rule. The property of non-stockholders is thus made to pay the taxes, some fifteen million dollars or more, which under the Constitution should be paid by those who have invested in such stocks.

This exemption of foreign stocks from all taxation is a very serious discrimination and adds to the exemption already made an additional exemption of at least $116,237,236, which were taxed last year, even if such foreign stocks had heretofore been all listed. The burden of taxation upon those not owning stocks is therefore increased by this statute exactly to the extent of the taxation which this property has paid, and it is the duty of the courts by *mandamus* to enforce the Constitution by requiring the Commissioner of Revenue to perform his duty by disregarding the illegal exemption and requiring such stocks to be taxed equally with other property.

It is true that in *Person v. Watts,* 184 N. C., 499, the majority of this Court declined to issue a *mandamus* to compel Mr. Watts, the then Commissioner of Revenue, to enforce the constitutional provision requiring the taxation of at least 1,500 million dollars of domestic stock which the statute had sought to exempt from all taxation. But that case is express authority against the defendant in this case for the contention for the validity of the act construed in *Person v. Watts* was rested upon the ground that as the domestic corporations paid taxes upon their property, or so much of it as was in this State, therefore the stockholders should not be taxed upon the stock which they had purchased from such corporations. But in this case the property is foreign stocks issued by corporations which have paid no taxes here, and therefore there is not the shadow of the semblance of a reason why the holders of such foreign stocks should be exempted from taxation. The owners of such stocks live here. They are protected at the expense of our citizens, by our courts and officers, in their lives, their persons and their property and should pay their proportionate part of the expenses of government, and are entitled to no other exemptions than are accorded to other citizens.

But even as to *Person v. Watts,* in the 184 N. C., at p. 499, while the majority of the Court dismissed that case upon the same technicality set up by the defendant in this, that a writ of *mandamus* was not the proper form of remedy—without pointing out what was the course by which a citizen could obtain his constitutional right not to be taxed

beyond what would be his fair share under the rule set out in the Constitution—still the Court, though indicating that to tax the stockholder upon his stock, if the corporation was taxed upon its property, would be double taxation, admitted that there was nothing which prohibited such double taxation (p. 508). Besides, that case was merely an *obiter dictum* upon the question of the exemption of domestic stocks, for the action was dismissed upon the form of the remedy asked not being the proper one, and therefore the opinion as to the exemption of stocks was outside the mark and purely *obiter*.

As *Person v. Watts* has been referred to, it is permissible to say that, upon reference to the dissenting opinion therein, it will be found that the Supreme Court of the United States, in many cases therein cited, has always held that the taxation of stocks in the hands of the owner *is not* double taxation simply because the corporation itself is taxed; and even if it were, it would not be unconstitutional. The United States Government acts on this and levies income tax on dividends received by stockholders from their stocks.

In *Pullen v. Corporation Commission,* 152 N. C., 553, *Manning, J.,* said: "It is likewise well settled by the language of our State Constitution, by many decisions of this Court and of the Supreme Court of the United States, and is now generally accepted law that the property of a shareholder of a corporation in its shares of stock is a *separate and distinct* species of property from the property, whether real, personal, or mixed, held and owned by the corporation itself as a legal entity. It would be useless to cite authority to support a proposition so well established and generally accepted."

*Brown, J.,* in the same case, concurring, says, at p. 562: "I agree, also, that it is well settled that the shares of stock in any corporation, when owned by individuals, are separate and distinct property from the assets of the corporation and *may be taxed as such.*"

In the same case, *Hoke, J.,* at p. 582, says, quoting from *Bank v. Tenn.,* 161 Tenn., 146: "The capital stock of a corporation and the shares into which such stock may be divided and held by individual shareholders, are two distinct pieces of property. The capital stock and the shares of stock in the hands of the shareholders may both be taxed, and it not double taxation. *Van Allen v. Assessors,* 70 U. S. (3 Wall.), 244, cited in *Farrington v. Tenn.,* 95 U. S., 678. This statement has been reiterated many times in various decisions by this Court, and is not now disputed by any one."

A later case, *Brown v. Jackson,* 179 N. C., 363, 371 (1920) cites and approves the above cases. The above decisions of this State and of the United States Supreme Court are uniform and without variation or shadow of turning, to the effect that the shares of stock in the hands of

the stockholders are separate and distinct from the tangible property, the franchise and capital stock of the corporation, and that it is *not double taxation* to tax the shares in the hands of the stockholders, and also to tax the franchises, capital stock and other property of the corporation. In our own Court there are many other cases to the same effect. *Comrs. v. Tobacco Co.,* 116 N. C., 446; *Chief Justice Smith,* in *Belo v. Comrs.,* 82 N. C., 415 (33 Am. Reports, 668); and *Ashe, J.,* in *Worth v. R. R.,* 89 N. C., 305; and this, indeed, is in accordance with all legal authorities and text-books.

There are other cases in this State, all to the same effect, quoted in the dissenting opinion, 184 N. C., at 527 *et seq.,* and the United States decisions to the same purport are uniform and quoted at p. 531 of that opinion, and the authorities in other States having the same provision as our Constitution are quoted in 184 N. C., pp. 532-536.

The whole subject of our constitutional requirement as to taxation may be thus summed up upon these authorities and others: *"In all cases where the Constitution, as in this State, requires that all property, real and personal, shall be taxed and by a uniform rule, it is unconstitutional to exempt the shares of the stockholders from taxation upon the ground that the property of the corporation, whether capital stock, franchises or tangible property, is taxed, especially when, as in our Constitution, 'investment in stocks and bonds' are mentioned as subject to this rule."* This statement cannot be met by quoting from States whose constitutions do not require equality in taxation like ours.

The law, as above stated, is also summed up in the following legal works of general scope: 37 Cyc., 758, 759, 821, and cases cited; 14 Corpus Juris, 387, 388, secs. 509 and 510; also Ruling Case Law, p. 184 (sec. 155), and 289 (sec. 284).

It has been well said that "the power to tax is the power to destroy," and it has been the history of the world over that wherever the power to tax has gotten into the hands of the few the result has been the continuing accumulation of great wealth in the hands of the exempted and the destruction ultimately of those who are thus forced to pay the taxes which should be borne proportionately by those who have procured exemption from all burdens. The result through the ages, wherever not checked, has been the decay of all nations where this has prevailed.

The unearned income from stocks and bonds is a potential taxable wealth, which the Constitution has not only made available for revenue, but has required that it shall be taxed at least equally with all other property. Stocks are sold by the corporation and become the absolute property of the stockholder. The stockholder can sell his stock, bequeath it, or otherwise dispose of it at will, like any other property. The corporation has no control whatever over it. He is not liable for

the debts of the corporation, and it is not liable for his debts. If an individual gives a bond for the payment of money, and even if he secures it by a mortgage, he remains liable for the tax upon the property which can be subjected to payment of it, and the holder is also liable to tax thereon. The stock is set out in all reports by corporations as a *liability*.

The exemption of so many hundreds of millions of dollars from all taxation by the influence of corporations who wish to sell their "tax-free" stocks, and by the purchasers of such tax-free stock, results in "double taxation," but this is laid upon those who do not have idle capital to invest in stocks and bonds. More and more the burden is laid upon productive enterprise—upon the man on the farm, the man in business. These give labor employment. These are the real wealth producers of the country and mainstay of its prosperity. It is certainly unfair that the "endowed loafer," with money invested in "tax-free" stocks, bonds or public securities, shall be permitted to shift his share of the expense of government entirely upon the productive industries. Those holding stocks and bonds, drawing unearned income, assuredly should at least pay as much proportionately as individuals and other forms of property which earn their income.

From the adoption of the Constitution in 1868, for twenty-one years, down to 1887, this provision guaranteeing uniformity and equality in taxation to all was observed. Then the influence of the corporations having stocks to sell, and of those seeking investments for their wealth which they desired to "invest free of taxation," began to be felt, notwithstanding the decisions of the courts above cited, that this could not be done under the Constitution. But it was not until 1921 that they achieved full success and the constitutional guarantee was fully and ruthlessly set aside by the act which now makes fully fifteen hundred million dollars of idle capital exempt from all taxation. The newspapers immediately swarmed with advertisements on one page of "tax-free" stocks for sale, and on another with the sheriff's advertisements of the property of the poorer classes for sale for taxes. When public attention was called to this breach of the Constitution, suddenly the advertisements of "tax-free" stocks disappeared from all the papers, and ever since the work has been done by brokers' letters to the rich, inviting purchasers of "tax-free" stocks.

There can be no reason or justice, even if there had been no constitutional guarantee against this discrimination, why millions invested by the very rich should be exempted from all taxation of every kind—State, county, and city—while those who own a little piece of land, giving a bare support for wife and children, should have their taxes raised many-fold to make up the deficiency and live under constant threat of

the sheriff's hammer. These plaintiffs were right in appealing to the courts, and are entitled to the remedy they seek, that their taxes may be lessened and they may live in less fear of a sheriff's sale.

That a *mandamus* lies in such a case as this was held by *Connor, J.,* in *R. R. v. Comrs.,* 148 N. C., 220, and by *Hoke, J.,* in *Perry v. Comrs., ib.,* 521. See numerous other cases cited to same effect, 184 N. C., 538-540. The great corporations and great wealth constantly appeal to the courts for remedies in their favor on tax questions. Why should redress be denied to the masses of the people when they are asking at the hands of their courts the enforcement of the constitutional guarantee to all the people of "equality and uniformity in taxation" and against the illegal exemption of great wealth, whether in corporate or in individual hands, by the non-taxation of their stocks which necessarily throws the payment of the taxes which their property should pay upon those classes which earn every dollar they get?

The plaintiffs are asking that this Court shall enforce the constitutional provision which requires that all property shall be taxed alike. They have asked that this Court hold, as it has often held in cases above cited, without hesitation, that any act of the Legislature giving an exemption of so many hundreds of millions of property from taxation, shall be held null and void. This Court, upon the plain and unmistakable language of the Constitution, should direct the Commissioner of Revenue to disregard the act conferring this exemption, because it is a violation of the Constitution, and relieve the struggling masses who are burdened with paying the taxes which should be borne by those who are able to invest their idle capital in stocks and bonds. It is a matter of no importance, under our Constitution and our statutes, whether the proceeding is called a *mandamus* or not. "A rose would smell as sweet by any other name." The people are entitled to the protection so plainly given them by their Constitution, and the officers of the law should be directed to enforce equal and uniform taxation as required by the plain provision of the organic law.

Our tax burdens should be apportioned justly—share and share alike—according to the amount of property held by each, with no exemptions of any property from taxation save that expressly authorized by the Constitution, Art. V, sec. 5.

The whole matter can be summed up as follows: The provision of the Constitution is too plain to be misunderstood that all *"investments* in stocks" shall be taxed *equally and uniformly* with all real and personal property, according to its true value in money; and, therefore, the act exempting these stocks in corporations of other States and countries, but held by owners residing here, is unconstitutional. They have always been taxed heretofore. *Brown v. Jackson,* 179 N. C., 367-374.

In *Person v. Watts, supra,* it was held that to tax the stocks in the hands of the owner when the corporation had paid taxes on its own property would be double taxation; but it was also held (p. 508) that there was nothing in our Constitution which forbade double taxation. The exemption of some fifteen hundred million dollars of property in stocks upon the ground that the Legislature has so enacted creates the only double taxation in this State, and that is caused by the fact that those who have not invested in stocks have to pay the taxes which the stocks should pay, as well as their own; and the Legislature, under the ruling in *Person v. Watts,* 184 N. C., at p. 508, can at any time, and in any view, lay the tax upon stocks as required by the Constitution and relieve those not owning stock of the more than "double taxation" now laid on them.

The United States Supreme Court has held repeatedly that "the Fourteenth Amendment does not prohibit double taxation." *Cream of Wheat Co. v. Great Forks,* 253 U. S., 330, and cases there cited. In *Kidd v. Alabama,* 188 U. S., 730, it was held that where the State, under its Constitution (unlike ours), was not required to impose a tax on the holders of stock in domestic railroads, it was still not unconstitutional to tax stocks held by citizens of Alabama in railroads in other States, citing numerous cases on p. 733.

I am of the opinion, therefore, that this Court should direct a *mandamus* to issue to the Revenue Commissioner that taxes should be laid upon the foreign stocks as prayed by the plaintiffs in this case, both under the authority of *Person v. Watts,* 184 N. C., 499, as well as under the broad terms of the Constitution, which requires that "all investments in stocks" shall be taxed by *uniform* rule with all other property, "real and personal, according to its true value in money." If the Constitution does not protect the people at large, what is it for?