R. K. CONSTANTIAN, A TAXPAYER OF ANSON COUNTY, ON BEHALF OF HIM-
SELF AND ALL OTHER TAXPAYERS OF ANSON COUNTY, v. ANSON COUNTY.   :

(Filed 6 June, 1956.)

**1. Schools § 10b—**

Where a bond order designates nine school plant facilities to be financed
thereby, constituting one complete program necessary in the judgment and
discretion of the school authorities to provide the additional plant facilities
for all school children of the county, the fact that the order states that
two of the projects are for use of colored children, does not show discrim-
ination against children of the white race in violation of Article IX, sec-
tion 2, of the Constitution of North Carolina.

**2. Schools §§ 10a, 3d—**

Under our Constitution it is the duty of the board of county commis-
sioners of each county to provide funds for the buildings and equipment
necessary for the maintenance and operation of public schools within the
county for the constitutional term, and such boards have no authority or
responsibility in the administration of school affairs, including the assign-
ment of pupils to particular schools, this being the function of the school
authority of each administrative unit.

**3. Constitutional Law § 18—**

The provision of the Federal Constitution that no state shall "deny to
any person within its jurisdiction the equal protection of the laws," is a
limitation upon the exercise of governmental power by a state or state
agency.

**4. Schools § 1—**

No provision of the Federal Constitution requires that a state maintain
a system of public schools, whether attendance be compulsory or voluntary,
this being exclusively a matter of state policy.

**5. Constitutional Law § 18: Schools § 3d—**

The Federal decision does not require that children of different races
be taught in the same schools, but declares only that if a child be excluded
from attending the school of his choice, solely on the basis of race, by a
state or state agency, he may assert his constitutional rights under the
equal protection clause of the Fourteenth Amendment to the Federal
Constitution.

**6. Schools §§ 1, 10b: Constitutional Law § 18—Proscription against en-
forced segregation in public schools does not affect validity of bonds to
provide funds for school facilities.**

The mandates of Article IX, sections 2 and 3, of the State Constitution
remain in full force and effect after striking, as violative of the Four-
teenth Amendment to the Federal Constitution, that portion of the 1875
amendment to section 2 which purports to make mandatory the enforced
separation of the races in the public schools of the State. Therefore, each
board of county commissioners remains under duty to provide funds for
the buildings and equipment necessary for the maintenance and operation

of public schools within the county, and a bond order, approved by the voters, to provide school facilities for all the children of the county, even though it contemplates the maintenance of separate schools for the races, will not be held invalid on the ground that the purpose for which the bonds were authorized cannot be realized, or that there is no authority to provide additional school plant facilities, or that the maintenance of public schools without mandatory provision for enforced separation of the races is unlawful in this State.

**7. Constitutional Law § 4—**

When a portion of a section of the State Constitution is invalid as violative of the Constitution of the United States, and the remaining portion is independent, complete in itself, and capable of enforcement, the invalid part will be rejected and the valid portion stand.

**8. Same—**

The Constitution of the United States takes precedence over the Constitution of North Carolina, and in the interpretation of the Federal Constitution, the Supreme Court of the United States is the final arbiter. Constitution of North Carolina, Article I, sections 3 and 5. Constitution of the United States, Article VI.

APPEAL by plaintiff from *Armstrong, J.,* March Term, 1956, ANSON.

Action by plaintiff, a citizen, property owner and taxpayer of Anson County, on behalf of himself and all other taxpayers of said county, to enjoin defendant from issuing and selling $750,000 of capital outlay school bonds.

A bond order adopted 19 May, 1952, by the Board of Commissioners of Anson County, and approved by a majority of the qualified voters of the county in an election held 28 June, 1952, authorized the issuance of $1,250,000 of capital outlay school bonds and the levy of taxes for the payment thereof.

The school plant facilities to be financed by the issuance of said bonds were described in the bond order, in the published notice of election and in the ballot used by the electors, as follows:

"(1) erection of a new elementary school building with gymnasium in Wadesboro, and (2) erection of a new high school building with gymnasium at a suitable location in the northwestern section of the county, and (3) remodeling and reconstruction of existing elementary school buildings, and (4) remodeling and reconstruction of the existing building used for the high school in Wadesboro, and (5) erection of a new building or an addition to an existing building suitable to provide eight rooms for colored children in Wadesboro, and (6) erection of a new building or an addition to an existing building suitable to provide four rooms for colored children in Polkton, and (7) erection of a new building to be used as a teach-

CONSTANTIAN v. ANSON COUNTY.

erage, and (8) acquisition of any land necessary for the erection of such new buildings or additions to existing buildings, and (9) acquisition and installation of the equipment necessary for such new or remodeled or reconstructed buildings or additions to existing buildings."

Defendant has issued $500,000 of said bonds. Of the seven *specific* projects, those designated (1), (3) and (6) have been completed; but those designated (2), (4), (5) and (7) have not been completed. Unless restrained, defendant will issue the remaining $750,000 of said bonds and use the proceeds to provide the uncompleted portion of the school plant facilities so authorized.

From these admitted facts, plaintiff draws legal conclusions, controverted by defendant, upon which he bases his right to injunctive relief. Plaintiff's contentions, as to the applicable law, will be stated in the opinion.

After hearing, the court denied plaintiff's application for injunctive relief; and, in accordance with defendant's pleading and prayer for relief, adjudged that "the proposed issuance of the remaining authorized $750,000 of bonds for school plant facilities in Anson County is authorized under law, and all such bonds when issued will in all respects be valid obligations of said county."

Plaintiff excepted and appealed, his sole assignment of error being that the court, in signing said judgment, misapplied the law to the facts.

*Bennett M. Edwards for plaintiff, appellant.*

*Taylor, Kitchin & Taylor and Reed, Holt, Taylor & Washburn for defendant, appellee.*

*Attorney-General Rodman and Assistant Attorney-General Giles, amici curiae.*

BOBBITT, J. The bond order and the election, authorizing the $1,250,000 issue, were approved by this Court in *Parker v. Anson County,* 237 N.C. 78, 74 S.E. 2d 338. Even so, plaintiff now insists that the bond order was and is void on its face because it discriminates against children of the white race in violation of the Constitution of North Carolina, Article IX, section 2. The sole basis for this contention is that the facilities identified in projects (5) and (6) were described as facilities *suitable for colored children.* This contention is clearly without merit.

Unquestionably, it was contemplated that projects (5) and (6) would make available additional plant facilities wherein only colored children would be taught. It was also contemplated that some or all of the

other projects would make available additional plant facilities wherein only white children would be taught. Any other inference would lose touch with reality. The nine projects constituted one complete program, reflecting the judgment and discretion of the school authorities in the three administrative units, designed to provide additional plant facilities for all school children of Anson County.

*Lowery v. School Trustees*, 140 N.C. 33, 52 S.E. 267, and *Bonitz v. School Trustees*, 154 N.C. 375, 70 S.E. 735, relied on by defendant, rather than *Williams v. Bradford*, 158 N.C. 36, 73 S.E. 154, relied on by plaintiff, are more nearly in point. However, the authority of these cases need not be invoked as a basis for decision here; for, based upon any reasonable interpretation thereof, the bond order on its face does not show discrimination against children of the white race.

Having reached this conclusion, there is no need to consider whether plaintiff, on principles of *res judicata,* is precluded by the decision in *Parker v. Anson County, supra,* from now making such contention.

Assuming the original validity of the bonds so authorized, plaintiff contends that, by reason of decisions of the Supreme Court of the United States made subsequent to such authorization, the *purpose* for which the bonds were authorized cannot now be realized. This *purpose,* plaintiff contends, was to finance additional school plant facilities for a public school system wherein the children of the white race and the children of the colored race would be taught in separate schools, the only system then lawful.

Sections 2 and 3, Article IX, Constitution of North Carolina, bear directly on the questions presented. Each section is quoted below.

"Sec. 2. The General Assembly, at its first session under this Constitution, shall provide by taxation and otherwise, for a general and uniform system of public schools, wherein tuition shall be free of charge to all the children of the State between the ages of six and twenty-one years. And the children of the white race and the children of the colored race shall be taught in separate public schools; but there shall be no discrimination in favor of, or to the prejudice of, either race."

As ratified 24 April, 1868, Article IX, section 2, consisted solely of the *first* of the two sentences. The *second* sentence was added by amendment adopted by the Constitutional Convention of 1875, ratified by the people in November, 1876, effective 1 January, 1877. Journal of the Constitutional Convention of 1875; Connor & Cheshire, The Constitution of North Carolina; *Elliott v. Board of Equalization,* 203 N.C. 749, 166 S.E. 918.

"Sec. 3. Each county of the State shall be divided into a convenient number of districts, in which one or more public schools shall be maintained at least six months in every year; and if the Commissioners of

any county shall fail to comply with the aforesaid requirements of this section, they shall be liable to indictment."

As ratified 24 April, 1868, Article IX, section 3, was as quoted except the words "four months" then appeared rather than the words "six months." This amendment, submitted by the General Assembly of 1917 (Ch. 192, Public Laws of 1917), became effective upon its ratifi-. cation by the people in November, 1917. *Elliott v. Board of Equalization, supra.*

These propositions are well established. Article IX, section 2, contains a mandate that the General Assembly provide for a State public school system. Article IX, section 3, contains a mandate that the board of commissioners of each county in the State provide the funds for the buildings and equipment necessary for the maintenance and operation of schools within the county for the constitutional term. *Marshburn v. Brown*, 210 N.C. 331, 186 S.E. 265. Full responsibility for the administration of school affairs and the instruction of children within each administrative unit, including the assignment of pupils to particular schools, rests upon the school authorities of such unit. *Parker v. Anson County, supra,* and cases cited. In short, when the board of commissioners provides the funds for the necessary buildings and equipment, it has no further responsibility or authority. The school authorities within each administrative unit have full responsibility and authority in respect of the school program.

It was the duty of the Board of Commissioners of Anson County to provide the funds for necessary plant facilities. The bond order set forth in express terms that $1,250,000 was needed for that purpose. The Board of Commissioners and the electorate authorized the bond issue to provide the funds necessary for such additional plant facilities. Nothing appears in this record to suggest that the needs are less in 1956 than in 1952. Indeed, the court below incorporated in the judgment a finding of fact, to which no exception was taken, that "additional school plant facilities for the public school system in Anson County are urgently needed now." When the bonds were authorized, the sole purpose in mind was to provide funds to meet the over-all capital outlay needs in respect of all school children of Anson County, white and colored. The school program, as distinguished from plant facilities, was not in issue or involved.

An entirely different question was presented to this Court in *Mauldin v. McAden*, 234 N.C. 501, 67 S.E. 2d 647, and *Gore v. Columbus County*, 232 N.C. 636, 61 S.E. 2d 890, and *Feezor v. Siceloff*, 232 N.C. 563, 61 S.E. 2d 714, and *Waldrop v. Hodges*, 230 N.C. 370, 53 S.E. 2d 263, and *Atkins v. McAden*, 229 N.C. 752, 51 S.E. 2d 484. In those cases, decision turned on whether subsequent findings in the light of changing

educational needs warranted the transfer or reallocation of funds from one project to another within the general purpose (school plant facilities) for which the bonds were authorized. Here there is no suggestion that the funds to be derived from the sale of the unissued bonds ($750,000) are to be transferred or reallocated from one project to another within the general purpose for which the bonds were authorized.

The phrase, *suitable for colored children,* used in connection with projects (5) and (6), connotes nothing beyond the fact that it was then contemplated that these would make available additional plant facilities wherein colored children would be taught. Obviously, physical school plant facilities and equipment are suitable for the teaching of children, irrespective of race or color.

We come now to the contention upon which plaintiff places major emphasis. It is this: When the bonds were authorized, Article IX, section 2, as construed by this Court, contained the *mandatory requirement* that children of the white race and children of the colored race be taught in separate schools. *Puitt v. Commissioners,* 94 N.C. 709; *Lowery v. School Trustees, supra.* Moreover, the validity of such mandatory requirement had the sanction of decisions of the Supreme Court of the United States; for, as late as 1927, *Chief Justice Taft,* speaking for a unanimous Court, had explicitly declared that each state had the right and discretion to determine, in respect of its public school system, whether the children of different races should be taught in the same or separate schools, "the same question which has been many times decided to be within the constitutional power of the state legislature to settle without intervention of the federal courts under the Federal Constitution." *Gong Lum v. Rice,* 275 U.S. 78, 72 L. Ed. 172, 48 S. Ct. 91. However, in 1954 the Supreme Court of the United States declared that the *enforced* separation of Negroes and whites in public schools *solely on the basis of race* denied to Negroes equal protection of the laws (*Brown v. Board of Education of Topeka,* 347 U.S. 483, 98 L. Ed. 873, 74 S. Ct. 686, 38 A.L.R. 2d 1180), and in its 1955 decision applied the proposition so declared to the cases before it (*Brown v. Board of Education of Topeka,* 349 U.S. 294, 99 L. Ed. 1083, 75 S. Ct. 753). The bonds were authorized when it was contemplated that children of the white race and children of the colored race would be taught in separate schools in compliance with Article IX, section 2, and not otherwise. Hence, the argument runs, both the bond order and the election were invalidated by the unprecedented action of the Supreme Court of the United States; for, plaintiff insists, if the school authorities cannot operate the schools in compliance with Article IX, section 2, there is no authority to provide additional school plant facilities when no lawful use thereof can be made for school purposes.

The Fourteenth Amendment to the Constitution of the United States provides, in part, that no state shall "deny to any person within its jurisdiction the equal protection of the laws." The limitation is upon the exercise of governmental power by a state or state agency. This is well settled and fundamental.

No provision of the Constitution requires that a state maintain a system of public schools, whether attendance be compulsory or voluntary. This is exclusively a matter of state policy. Moreover, in respect of a state public school system, nothing in the *Brown case* requires that children of different races be taught in the same schools. The doctrine therein declared, to be put into effect in specific cases "with deliberate speed" as conditions may warrant, is that no child, whatever his race, may be excluded from attending the school of his choice solely on the basis of race. If so excluded by the state or a state agency, he may assert his constitutional rights under the equal protection clause of the Fourteenth Amendment as interpreted in the *Brown case.* In substance, this is the interpretation placed upon the *Brown case* by the three-judge district court, composed of *Parker* and *Dobie, Circuit Judges,* and *Timmerman, District Judge,* upon rendering their decision 15 July, 1955, in *Briggs v. Elliott,* 132 F. Supp. 776. No one can now foretell in what localities or in what buildings or to what extent children of the white race and children of the colored race will be taught in the same public schools in North Carolina.

The impact of the decisions in the *Brown case,* in respect of the *operation* of public schools in Anson County, applies equally to the school plant facilities existent prior to the bond order and election, the school plant facilities provided by the bonds sold ($500,000) and the school plant facilities to be provided by the proceeds from the sale of the unissued portion ($750,000) of the authorized issue of $1,250,000. In this respect, there is nothing distinctive about the uncompleted projects for which the bonds were authorized.

If plaintiff's contention were adopted, all authorized (unissued) bonds for school plant facilities, as well as all previously authorized special tax supplements within administrative units, throughout the State, would be invalidated. Applicable legal principles impel the opposite conclusion.

The mandate to the General Assembly (Article IX, section 2), and the mandate to the board of commissioners of each county (Article IX, section 3), discussed above, were part and parcel of the original (unamended) Constitution of 1868. These are the constitutional mandates upon which our public school system is based. See, also, Constitution of North Carolina, Article I, section 27; Article IX, sections 1, 4, 5, 8, 9 and 11. It was the amendment of 1875, which provided that, in

obeying the original mandates, a specific method was required, namely, that "the children of the white race and the children of the colored race shall be taught in separate public schools." Only that portion of the 1875 amendment which purports to make *mandatory* the *enforced* separation of the races in the public schools is now held violative of the ᵃqual protection clause of the Fourteenth Amendment to the Constitution of the United States. Otherwise, the mandates of Article IX, sections 2 and 3, remain in full force and effect. The provisions thereof, absent the mandatory requirement of enforced separation, are complete in themselves and capable of enforcement. Their separable and independent status is manifest. They antedate the 1875 amendment. They survive the invalidation of the mandatory requirement of enforced separation contained in the 1875 amendment.

Now as in 1952, Article IX, section 2, is a mandate that the General Assembly provide for a State public school system. Now as in 1952, Article IX, section 3, is a mandate to the board of commissioners of each county in the State to provide the funds for the buildings and equipment necessary for the maintenance and operation of public schools within the county for the minimum term.

"A statute may be valid in part and invalid in part. If the parts are independent, or separable, but not otherwise, the invalid part may be rejected and the valid part may stand, provided it is complete in itself and capable of enforcement." 82 C.J.S., Statutes sec. 92. Our decisions are in accord. *R. R. v. Reid,* 187 N.C. 320, 121 S.E. 534; *Lowery v. School Trustees, supra.* This well established rule applies equally when a portion of a state constitution or any provision thereof is invalid as violative of the Constitution of the United States.

The final (contradictory) contention of plaintiff is that, assuming that teaching of children of the white race and of the colored race in the same school is now permissible under the decision in the *Brown case,* the issuance of the bonds ($750,000) is for an unlawful purpose under North Carolina law. The fallacy underlying this contention is that the mandatory requirement as to enforced separation, incorporated in Article IX, section 2, by the 1875 amendment, is no longer the law in North Carolina.

Our deep conviction is that the interpretation now placed on the Fourteenth Amendment, in relation to the right of a state to determine whether children of different races are to be taught in the same or separate public schools, cannot be reconciled with the intent of the framers and ratifiers of the Fourteenth Amendment, the actions of the Congress of the United States and of state legislatures, or the long and consistent judicial interpretation of the Fourteenth Amendment. However that may be, the Constitution of the United States takes precedence

over the Constitution of North Carolina. Constitution of North Caro-
lina, Article I, section 3 and 5; Constitution of the United States,
Article VI. In the interpretation of the Constitution of the United
States, the Supreme Court of the United States is the final arbiter. Its
decision in the *Brown case* is the law of the land and will remain so un-
less reversed or altered by constitutional means. Recognizing fully that
its decision is authoritative in this jurisdiction, any provision of the
Constitution or statutes of North Carolina in conflict therewith must
be deemed invalid.

The Florida Supreme Court, in *Board of Public Instruction v. State,*
75 So. 2d 832, and the Supreme Court of Oklahoma, in *Matlock v.
Board of County Commissioners,* 281 P. 2d 169, on similar but some-
what variant factual situations, have reached conclusions generally in
accord with the decision of this Court.

For the reasons stated, the judgment of the court below is
Affirmed.