# Wytheville.

## CITY OF PORTSMOUTH v. WEISS, ETC.

### June 17, 1926.

1. STATUTES—*Constitutionality—Stare Decisis—Statute Attacked upon Different Grounds.*—In the instant case the constitutionality of a similar statute had recently been upheld by the Supreme Court of Appeals. But defendant in error contended that that case was not in point because the statute was attacked upon entirely different grounds. Whenever a statute is enforced by a judgment or decree of a court, it is a judicial determination that the statute is a valid enactment and is free from *all constitutional objections.* If unconstitutional for any reason, whether assigned or not, the statute is void. It was therefore wholly immaterial that the attack upon the statute in the recent case was upon entirely different grounds.

2. STATUTES—*Constitutionality—Doubtful Constitutionality—Presumption of Constitutionality.*—Whenever a statute is enacted by the legislature, it is a legislative declaration that it is a constitutional enactment, and when approved by the Governor it is an executive declaration to the same effect. Hence the oft-repeated declaration that all doubts about the constitutional validity of a statute are to be resolved in favor of its validity, and that there is no such thing as a statute of doubtful constitutionality.

3. MUNICIPAL CORPORATIONS—*Notice of Claim against Municipal Corporations—Power of Legislature.*—It is within the power of the legislature to require notice to a municipality or an officer thereof, of a claim for injury against the municipality, and it is not a violation of the constitutional rights of the injured party or an unwarranted discrimination between municipal and private corporations to require the giving of notice within a limited period, or the presentation of a claim to the municipal authorities as a condition precedent to an action at law, or to an action at law of a certain class, against a municipal corporation, provided such requirement be not unreasonable.

4. MUNICIPAL CORPORATIONS—*Notice of Claim against Municipal Corporations—Regulation of Practice.*—It may well be doubted whether the notice of the accident, required as a prerequisite in a suit against the municipal corporation, is a regulation of practice within the meaning of the Constitution.

5. MUNICIPAL CORPORATIONS—*Special Legislation.*—Section 117 of the

Constitution of 1902, prohibiting special acts in relation to the organization and government of municipalities, except in the manner provided for in Article 4, of the Constitution, must be construed in connection with section 63 of the Constitution of 1902, providing that the General Assembly shall not enact any local, special or private law, regulating the practice in or the jurisdiction of or changing the rules of evidence in any judicial proceedings.

6. CONSTITUTIONAL LAW—*Construction—All Provisions Read Together.*—In construing a constitutional provision it is the duty of the court to have recourse to the whole instrument, if necessary, to ascertain the true intention and meaning of any particular provision, and if there is an apparent repugnancy between different provisions the court should harmonize them if possible. Frequently the meaning of one provision of the Constitution, standing by itself, may be obscure or uncertain, but is readily apparent when resort is had to other portions of the same instrument. No one provision of the Constitution is to be separated from all the others and to be considered alone, but all of the provisions bearing upon a particular subject are to be brought into view and to be so interpreted as to effectuate the great purpose of the instrument.

7. MUNICIPAL CORPORATIONS—*Special Legislation.*—Special charters of municipal corporations or amendments thereof conferring rights and powers different from and in addition to those conferred by general statutes are authorized by the Constitution when enacted in conformity with Article IV and section 117 of the Constitution; when the enactment is published by the State as a statute, there is at least a *prima facie* presumption, in the absence of evidence to the contrary, that the charter, or amendment thereof, was enacted in the manner required by the Constitution; and that the rights and powers conferred are within the legislative power to grant.

8. MUNICIPAL CORPORATIONS—*Notice of Injury in Writing—Validity of Requirement—Case at Bar.*—The provisions in the amendment to the charter of the city of Portsmouth (Acts of 1918, ch. 20), requiring notice of injury to be filed with the city manager as a prerequisite to an action for damages against the city for negligent injury, was a valid constitutional enactment, and conferred upon the city the right to demand the notice mentioned in the enactment.

9. CONSTITUTIONAL LAW—*Special, Local and Private Laws—Municipal Corporation—Sections 63 and 117 of the Constitution of 1902—The General Gives Way to the Specific.*—If section 63 of the Constitution, forbidding the passage of any local, special or private law regulating the practice in any judicial proceeding, is apparently in conflict with section 117, the conflict is more apparent than real. Section 63 must be held to apply to cases not otherwise specially provided for. It cannot be supposed that the convention intended to impose upon the legislature any other restraints in the enactment or amendment of

charters of municipal corporations than those imposed by section 117. It was dealing with that specific subject, and threw around it all the safeguards it deemed necessary. The general must give way to the specific in the construction of constitutional provisions.

10. MUNICIPAL CORPORATIONS—*Notice of Claim against Municipal Corporations—Negligence—Affirmative Wrong.*—Where a city charter required notice of injury to the city manager, only where an action is brought for injury to any person or property alleged to have been sustained by reason of the negligence of the city, or any officer, agent or employee thereof, the notice is unnecessary where no negligence was charged in the declaration or shown in the evidence and plaintiff complained of a positive, affirmative wrong done by the city, a trespass on his property, a private nuisance; *e. g.*, the flooding of his lands by the city by a dam across a ditch.

11. MUNICIPAL CORPORATIONS—*Waters and Watercourses—Liability for Flooding Lands—Liability for Nuisances.*—A municipal corporation has no more right than a private individual to collect surface water from its property into an artificial channel and discharge it on the lands of another nor to divert a natural stream from its course and so discharge it at another place, nor has it any immunity from creating or maintaining a nuisance.

12. MUNICIPAL CORPORATIONS—*Notice of Claim against Municipal Corporations—Construction.*—Charter or statutory provisions requiring notice as a condition precedent to asserting a claim against a municipal corporation are said to be in derogation of common right, and hence are to be strictly construed and not extended by implication beyond their own terms.

13. MUNICIPAL CORPORATIONS—*Notice of Claim against Municipal Corporations—Affirmative Wrong.*—No notice is required in actions against municipalities where the injury complained of results from the affirmative wrongful act of the defendant.

14. BILL OF PARTICULARS—*Appeal and Error—Discretion of Court—Reversal for Refusal of Bill.*—The granting or refusing of a bill of particulars lies in the sound judicial discretion of the trial court, but its action is subject to review by the Supreme Court of Appeals, and will be reversed where the failure to require such bill, upon a request, was plainly prejudicial to the adverse party.

15. BILL OF PARTICULARS—*When Party Entitled to Bill of Particulars.*—If the pleadings do not give the information necessary to enable the adverse party to intelligently concert his reply, then he is entitled to a bill of particulars giving such information, and it is error to refuse it.

16. BILL OF PARTICULARS—*Flooding Lands—Plants Destroyed—Case at Bar.*—The declaration in the instant case notified the defendant that the plaintiff has sixty acres of land planted in "bulbs" which the defendant had destroyed by flooding his lands. There were many kinds of bulbs of different value and productiveness.

*Held:* That the defendant was entitled to information as to the quality and kinds of bulbs; and that it was error to refuse to grant defendant's request for the bill of particulars.

17. Bill of Particulars—*Failure to Grant Bill of Particulars—Excuse for Failure to File Bill of Particulars—Case at Bar.*—In the instant case, an action by plaintiff for destruction of "bulbs" planted by him and destroyed by the flooding of his lands by defendant, plaintiff claimed that it was inherently impossible to make fuller disclosure than had been made in the declaration, but in plaintiff's brief was an itemized statement of what the plaintiff proved on the trial, which furnished the very information that could and should have been furnished by a bill of particulars.

*Held:* That the action of the trial court in refusing to compel plaintiff to furnish a bill of particulars, was error.

18. Bill of Particulars—*Excuse for Failure to Give Bill of Particulars—Case at Bar.*—In the instant case the refusal of the trial court to compel plaintiff to furnish a bill of particulars was assigned as error. Plaintiff asserted that in efforts to compromise the case before trial, defendant was furnished with full data; but this statement was denied by defendant's counsel.

*Held:* That even if true, plaintiff was not bound by such data given before suit brought, and defendant was entitled to be informed officially by the pleadings and the proceedings in the case what demand the plaintiff was making upon it.

19. Waters and Watercourses—*Flooding of Lands—Damages—Destruction of Crops.*—The true measure of damages for a loss or partial destruction of a growing crop is the value of the crop in the condition it was at the time and place of destruction.

20. Waters and Watercourses—*Flooding of Lands—Damages—Destruction of Crops—Case at Bar.*—In the instant case, an action by plaintiff for destruction of his crops through the flooding of his land by defendant, the trial court directed the jury to consider what would be the probable yield of the crop and the value of that yield at maturity, and to take from it the expense of maturing, harvesting and marketing.

*Held:* That this was a fair way of estimating the value of the crop at the time of its destruction.

21. Waters and Watercourses—*Flooding of Lands—Statute of Limitations—Case at Bar.*—In the instant case, an action for damages to plaintiff's bulbs from the flooding of his land by a dam erected by defendant, defendant asked the court to instruct the jury that if they believed from the evidence that the continuance of the dam was necessarily an injury to the plaintiff from the time of its erection and that it was of a permanent character and was erected five years prior to the institution of the suit, then they must find for defendant.

*Held:* That this instruction was properly refused on the authority of

*Watts v. Southern Railway Company,* 134 Va. 503, which holds that in such case the cause of action accrued and the statute begins to run at the time the damage commenced and not at the time when the construction was completed.

22. WATERS AND WATERCOURSES—*Flooding of Lands—Floods—Extraordinary Rainfall—Case at Bar.*—In the instant case, an action for flooding plaintiff's land, the court instructed the jury that if the damage was due to an extraordinary rainfall, they must find for defendant. And that by extraordinary rainfall is not meant such a downpour of rain as may not have been known to occur, but only such rainfall that is so unusual and extraordinary that men of ordinary prudence would not have anticipated and provided for; but *floods such as from climatic and geographical conditions may reasonably be expected, whether of frequent or infrequent occurrence must be taken into* consideration in estimating hazards attending the obstruction of watercourses. This was substantially the instruction asked by defendant except for the words in italics which were supplied by the court.

*Held:* That the modification correctly stated the law.

Error to a judgment of the Circuit Court of Norfolk county, in an action of trespass on the case. Judgment for Plaintiff. Defendant assigns error.

*Reversed.*

The opinion states the case.

*R. C. Barclay* and *John W. Harper,* for the plaintiff in error.

*Wm. G. Maupin,* for the defendant in error.

BURKS, J., delivered the opinion of the court.

This was an action against the city of Portsmouth to recover damages for flooding the lands of the plaintiff and destroying a crop of bulbs growing thereon. The flooding took place in July, 1922, and this action was not brought until July, 1924. There was a verdict and judgment for the plaintiff for $7,300.

The city of Portsmouth owns and controls a canal or

ditch eleven miles long and originally twenty-six feet wide and eleven feet deep. The flow of the canal was towards the north, and the waters draining from the swamp into it would normally flow in a northern direction and empty into Deep creek, a tidal watercourse. The Portsmouth canal was intended to furnish a water supply for the city of Portsmouth. The water was taken out of Lake Drummond and conveyed to a point near the city. It was not intended to collect surface water, but necessarily did so in case of heavy rains. It was dug by a commission of seven freeholders of the city of Portsmouth, under authority of an act of the legislature conferring that power, and the act provided that $75,000 of the funds of the city should be used towards this purpose. The act conferred certain powers and imposed certain duties upon the commissioners and directed that when those powers and duties had been exercised and performed the canal should be turned over to the city of Portsmouth. Before the commissioners had completed their work, but after the canal was dug, the city abandoned the idea of using the canal as a supply for the city.

The Lake Drummond or Dismal Swamp canal, which was dug nearly a century ago, is a large canal used commercially for transportation and runs practically parallel with the Portsmouth canal, and about two miles east of it.

There is still a third canal. The Richmond Cedar Works canal, about five miles long and practically the same size of the Portsmouth canal, runs at right angles to the other two canals nearly due east and west. Its western end is in the swamp some three miles west of the Portsmouth canal, and it runs from that point eastwardly about three miles, when it reaches and cuts across Portsmouth canal, and again continues in the

same easterly direction for two miles further to the Lake Drummond or Dismal Swamp canal, into which it empties. It intersects the Portsmouth canal about three miles from its northern end. The water level in the Dismal Swamp canal is about eighteen inches higher than the bottom of the Portsmouth canal, hence in dry seasons the water in the Dismal Swamp canal would flow back through the Cedar Works canal into the Portsmouth canal, and thence empty into Deep creek above mentioned. On the other hand, if the water was high in the Dismal Swamp canal, the Cedar Works canal would operate as a spillway for the Dismal Swamp canal and cause it to overflow.

Under these conditions, the Dismal Swamp Canal Company built a dam in the Portsmouth canal about two hundred and fifty feet north of its intersection with the Cedar Works canal, the effect of which would be to obviate the two difficulties above mentioned. This dam was four or five feet higher than the level of the water in the Portsmouth canal at times of still water. At the time of the injury complained of there had been almost continuous rains in the Dismal Swamp for about a month, culminating in a heavy rain about July 20, 1922, the effect of which was that the Portsmouth canal was filled to overflowing with water which poured over the dam across the canal and also over the sides of the Cedar Works canal between the Portsmouth canal and the Dismal Swamp canal, the effects of which were to cause the water overflowing these canals to flood the lands of the defendant in error which lay between the Portsmouth canal and the Dismal Swamp canal, in a northeastern direction from the Cedar Works canal. The defendant in error had been for many years a grower of bulbs, and had cultivated them in large quantities on his farm. The slope of the land is from the Cedar Works canal in a northerly direction.

The dam across the Portsmouth canal was originally put in about 1916 or 1917 by the Dismal Swamp Canal Company, which maintained it for several years, and thereafter it was taken over by the city of Portsmouth and was being maintained by it at the time of the injury complained of. The city was interested in keeping it there because there had been overflows from its canal near its northern terminus on other lands, resulting in litigation against the city. As said in the brief for the defendant in error:

"The summer of 1922 was a very wet season. Much rain fell and the swamp became saturated with water which drained into the Portsmouth canal, filling it, and flowed, with a swift current, northwardly. It was held up by the dam and diverted into the Cedar Works canal, already carrying its own drainage water, until the level of both canals was bank-high. The water so dammed back overflowed the east bank of the Portsmouth canal, between the dam and the Cedar Works canal, where the bank was low, and overflowed the country to the east and north. The water was raised so high in the Cedar Works canal that it overflowed the north bank thereof where the shallow Western Mill ditch intersected it, and, overflowing the banks of the Mill ditch, inundated the surrounding fields. Through these overflows the plaintiff's farm was submerged by the water brought down from the swamp, covered to an average depth of eighteen inches—in places waist deep —and continued in that condition for five days.

"Finally, the pressure of water against the dam grew so great the dam washed out; and the city of Portsmouth promptly sent its engineer and a crew of men to repair it, which they did, as quickly as they could, * * *

"Up to the time of this overflow the plaintiff's bulbs were in a flourishing condition. The result of the over-

flow was that large numbers of the bulbs were killed. He instituted this action, alleging invasion of his premises by the city and resultant injury, and he obtained verdict and judgment for $7,300.00.''

There was a demurrer to the declaration and to each count thereof, the chief ground of which was that the "declaration does not show that a written statement as required by an act of the General Assembly of Virginia, approved February 5, 1918 (Laws 1918, c. 20), was filed with the city manager of the defendant city" within thirty days after said alleged injury was received or sustained. The plaintiff joined in the demurrer, but insists that he was not obliged to give such notice because (1) the act of Assembly relied on is unconstitutional, but, even if constitutional, (2) the act, by its express terms, is only applicable where the injury is alleged to have been sustained by reason of the negligence of the city, and that this is not a case of a negligent injury.

The act (Laws 1918, c. 20) relied on is as follows:

"Section 31-a. No action shall be brought against the city of Portsmouth for damages for an injury to any person or property alleged to have been sustained by reason of the negligence of the city, or of any officer, agent, or employee thereof, unless a written statement, verified by the oath of the claimant, his agent or attorney, of the nature of the claim and of the time and place at which the injury is alleged to have occurred, or been received, shall have been filed with the city manager of said city within thirty days after the injury occurred; the said statement may be verified and filed either by the person injured, the owner of the property damaged, the personal representative, agent, or attorney of said person or owner. And in any action against the city to recover damages against it for any negligence,

where any person is liable with the city for such negligence every such person shall be joined as defendant with the city in any action brought to recover damages for such negligence, and when there is a verdict and judgment against the city, as well as the other defendant, it shall be ascertained by either the court or the jury which of the defendants is primarily liable for the damages assessed."

This act is substantially the same as the provisions of the charter of the city of Richmond, the validity of which was upheld in *O'Neil* v. *City of Richmond*, 141 Va. 168, 126 S. E. 56. In that case the constitutionality of the act was assailed on the grounds, (1) that the act was broader than its title, and (2) that it violates section 4 of the Bill of Rights, declaring that "no man or set of men is entitled to exclusive or separate emoluments or privileges from the community but in the consideration of public service; which, not being descendible, neither ought the office of magistrate, legislator or judge be hereditary."

[1] In the brief of counsel for the defendant in error it is said: "We are not unmindful of the case of *O'Neil* v. *City of Richmond*, 141 Va. 168, 126 S. E. 56, where the constitutionality of a similar statute was recently upheld by this court; but that case is not in point here, for the statute was attacked upon entirely different grounds, and nothing in the opinion is germane to the point raised here."

It is a grave mistake to suppose the case is not in point. It is wholly immaterial that the attack upon the statute in that case was "upon entirely different grounds." Whenever a statute is enforced by a judgment or decree of a court, it is a judicial determination that the statute is a valid enactment and is free from *all constitutional objections.* If unconstitutional for any reason, whether assigned or not, the statute is void.

[2] Whenever a statute is enacted by the legislature, it is a legislative declaration that it is a constitutional enactment, and when approved by the Governor it is an executive declaration to the same effect. Hence the oft-repeated declaration that all doubts about the constitutional validity of a statute are to be resolved in favor of its validity, and that there is no such thing as a statute of doubtful constitutionality.

[3] In *O'Neil* v. *City of Richmond, supra,* the statute was assailed on the ground that the act was broader than its title, and also because it was class legislation conferring special privileges upon the city. Both of these objections were overruled. In the instant case the statute is assailed because in contravention of section 63 of the Constitution, which declares that "the General Assembly shall not enact any local, special or private law in the following cases; * * * regulating the practice in, or the jurisdiction of, or changing the rules of evidence in any judicial proceedings, or enquiry before the courts or other tribunals." It is earnestly insisted that the statute under review is a "local, special or private law" regulating the practice in actions for negligence against the city of Portsmouth. All the statute does is to require "a written statement of the particulars of the accident, verified by affidavit (to) be filed with the city manager within thirty days after the injury occurs," as a condition precedent to the right to sue. Such statutes are very common, and as said in 19 R. C. L., sec. 329, p. 1040: "It is undoubtedly within the power of the legislature to impose such a requirement, and it is not a violation of the constitutional rights of the injured party or an unwarranted discrimination between municipal and private corporations to require the giving of notice within a limited period, or the presentation of a claim to the municipal

authorities as a condition precedent to an action at law, or to an action at law of a certain class, against a municipal corporation, provided such requirement be not unreasonable."

In *O'Neil* v. *City of Richmond*, 141 Va. 168, 172, 126 S. E. 56, 57, it is said: "The reasons for these statutes have been frequently indicated. They afford the city authorities the opportunity to investigate the circumstances, examine the locality in which the injury is alleged to have occurred, and to discover the witnesses promptly so as to ascertain the facts while their recollections· are fresh. Such statutes tend to discourage and avoid the expense of litigation because if the investigation discloses legal liability a prompt settlement is both proper and probable. They also tend to prevent perjury and fraud as well as to avoid injustice growing out of the failure of the witnesses to recollect clearly occurrences long past before they are called upon to testify, and thus better to safeguard unfounded claims. [Tonn.] *Tenn* v. *City of Helena*, 42 Mont. 127, 111 Pac. 715, 36 L. R. A. (N. S.) 1136; *Weisman* v. *New York*, 219 N. Y. 178, 114 N. E. 70; Ann. Cas. 1918 E. 1023."

The propriety of such statutes is well illustrated by the facts of the instant case, where suit was not brought for two years after the injury, and the trial did not take place till about six months thereafter.

[4] It may well be doubted whether the notice required as a prerequisite to sue was a regulation of practice within the meaning of the Constitution. But it is unnecessary to pass on that question.

Municipal corporations are given very large powers of self-government. They have extensive powers of taxation and are subjected to pains and penalties unknown

to other political subdivisions of the State.   This is
especially noticeable with reference to negligence in
the exercise of their corporate powers.   It was to be
expected, therefore, that, in framing the Constitution,
some provision would be made to enable them to care
for their special interests and to protect themselves
against improper litigation.   Usually this could be done
by general laws applicable to all municipal corporations,
but the Convention realized that there might be cases
where it would be desirable to confer special powers,
or special privileges, on one not needed or required by
all, and hence we find it provided by section 117 of the
Constitution that "general laws for the organization
and government of cities and towns shall be enacted
by the General Assembly, and no special act shall be
passed in relation thereto, except in the manner pro-
vided in article four of this Constitution, and this only
by a recorded vote of two-thirds of the members elected
to each house."

[5] This section has been twice construed by this
court.   *Miller* v. *Pulaski*, 109 Va. 137, 63 S. E. 880,
22 L. R. A. (N. S.) 552; *Town of Narrows* v. *Giles
County*, 128 Va. 572, 105 S. E. 82.   In both of these
cases the validity of the special charters was upheld.
We must, therefore, construe section 117 of the Con-
stitution in connection with section 63 so much relied
on.

[6]   The following statement from 66 R. C. L., p.
47, sec. 41, correctly states the rule with reference to
the construction of constitutional provisions and is
amply supported by the authorities there cited:   "In
construing a constitutional provision it is the duty of
the court to have recourse to the whole instrument, if
necessary, to ascertain the true intention and meaning
of any particular provision, and if there is an apparent

repugnancy between different provisions the court should harmonize them if possible. Frequently the meaning of one provision of the Constitution, standing by itself, may be obscure or uncertain, but is readily apparent when resort is had to other portions of the same instrument. It is, therefore, an established canon of constitutional construction that no one provision of the Constitution is to be separated from all the others and to be considered alone, but that all of the provisions bearing upon a particular subject are to be brought into view and to be so interpreted as to effectuate the great purpose of the instrument.

[7] The last two mentioned cases are authority for the proposition that special charters of municipal corporations or amendments thereof conferring rights and powers different from and in addition to those conferred by general statutes are authorized by the Constitution when enacted in conformity with article IV and section 117 of the Constitution; that when the enactment is published by the State as a statute, there is at least a *prima facie* presumption, in the absence of evidence to the contrary, that the charter, or amendment thereof, was enacted in the manner required by the Constitution; and that the rights and powers conferred are within the legislative power to grant.

[8, 9] In view of these holdings, and especially in the absence of any evidence to the contrary, we are satisfied that the amendment of the charter of the city of Portsmouth was a valid constitutional enactment, and conferred upon the city the right to demand the notice mentioned in said amendment. If section 63 of the Constitution, forbidding the passage of any local, special or private law regulating the practice in any judicial proceeding, is apparently in conflict with section 117, the conflict is more apparent than real. Sec-

tion 63 must be held to apply to cases not otherwise specially provided for. It cannot be supposed that the convention intended to impose upon the legislature any other restraints in the enactment or amendment of charters of municipal corporations than those imposed by section 117. It was dealing with that specific subject, and threw around it all the safeguards it deemed necessary. If these were complied with, the power of the legislature in reference thereto was unrestrained. The language of section 63 is general, that of 117 is specific. The general must give way to the specific, and section 63 applied to cases not otherwise specifically provided. In this way the two sections are made to harmonize, and the apparent repugnancy is avoided.

Conceding then the constitutional validity of the amendment, our next inquiry is, does it apply to the facts of the instant case?

[10] The amendment requires the notice only where an action is brought for injury to any person or property alleged to have been sustained by reason of the *negligence* of the city, or any officer, agent or employee thereof. Is this instant case one of negligence?

No negligence was charged in the declaration, and none was attempted to be shown by the evidence. Plaintiff complains of a positive, affirmative wrong done by the city, a trespass on his property, a private nuisance. Much was said in the argument about the ditch having been dug by a commission appointed by the legislature, and the fact that it was never formally turned over to the city. We shall not stop to consider the effect of the fact that the commission was composed of seven freeholders of the city, appointed at its instance and paid out of its funds, nor of other matters in connection therewith. No complaint is made of the manner in which the ditch was dug, or of the effect of

digging it.   The complaint is that the city *maintained a dam* across the ditch, which was the proximate cause of the injury complained of.   The evidence is clear that the dam was originally built across the Portsmouth ditch by the Dismal Swamp Canal Company which maintained it for several years, "until Portsmouth city took hold of it and kept it repaired," and at the very time of the injury complained of, when the dam washed out, the city engineer of the city of Portsmouth was present with a force of hands and repaired and replaced the dam as soon as the water subsided sufficiently to permit it.   The legislature authorized the construction of the ditch, but not the construction or maintenance of the dam; nor could it do the latter if the effect was to flood the lands of another, as this would be damaging private property for a public use without making just compensation therefor.

The plaintiff bases his right of recovery not on the negligence of the city, but upon the affirmative wrong done by it to his property, calling for the application of the doctrine of *sic utere tuo*, in which the question of negligence is not involved.

[11] A municipal corporation has no more right than a private individual to collect surface water from its property into an artificial channel and discharge it on the lands of another nor to divert a natural stream from its course and so discharge it at another place, nor has it any immunity from creating or maintaining a nuisance.   *Baker* v. *Akron*, 145 Iowa 485, 122 N. W. 926; 30 L. R. A. (N. S.) 619; *Phinizy* v. *City of Augusta,* 47 Ga. 263; *Kahoe* v. *Borough of Rutherford*, 74 N. J. Law, 659, 65 Atl. 1047, 122 Am. St. 411.

[12] Charter or statutory provisions requiring notice as a condition precedent to ascertaining a claim against a municipal corporation are said to be in derogation of

common right, and hence are to be strictly construed and not extended by implication beyond their own terms. 28 Cyc. 1450; 19 R. C. L., p. 1041, sec. 330.

[13] The act of the city in maintaining the dam was not a mere act of negligence, but one of malfeasance—doing an act that was wholly wrongful—resulting in a trespass on the land of the plaintiff and causing him great damage. It was an affirmative wrongful act, not authorized by law, and not the mere negligent performance of a lawful act. The city had no authority to build or maintain a dam that would flood the lands of the plaintiff, and no question of negligence is involved. A number of cases construing similar statutes hold that no notice is required in action against municipalities where the injury complained of results from the affirmative wrongful acts of the defendant. *Nienow* v. *Village of Mapleton*, 144 Minn. 60, 174 N. W. 517; *City of Ironton* v. *Weihle*, 78 Ohio St. 41, 84 N. E. 425; *Ahrens* v. *City of Rochester*, 97 App. Div. 480, 90 N. Y. Supp. 744; *McCarty* v. *Town of Mountain View*, 136 Tenn. 133, 188 S. W. 595; *Hughes* v. *City of Fond du Lac*, 73 Wis. 380, 41 N. W. 407. See also *Gillison* v. *City of Charleston*, 16 W. Va. 282, 37 Am. Rep. 763, and *Ashley* v. *Port Huron*, 35 Mich. 296, 24 Am. Rep. 552.

As the statute does not apply to the instant case, the trial court committed no error in overruling the demurrer to the declaration.

The failure of the trial court to compel the plaintiff to file a statement of the particulars of his claim is assigned as error.

Section 6091 of the Code is as follows: "In any action or motion the court may order a statement to be filed of the particulars of the claim, or of the ground of defense; and, if a party fail to comply with such

order, may, when the case is tried or heard, exclude evidence of any matter not described in the notice, declaration, or other pleading of such party so plainly as to give the adverse party notice of its character."

[14, 15] The granting or refusing of a bill of particulars lies in the sound judicial discretion of the trial court, but its action is subject to review by this court, and will be reversed where the failure to require such bill, upon a request, was plainly prejudicial to the adverse party. The object of the statute was to enable the adverse party to prepare his case for trial and to prevent surprise. We have repeatedly said that every litigant is entitled to be told by his adversary in plain and explicit language what is his ground of complaint or defense. The object of litigation is to do justice between the parties, and this cannot be done unless each one is given reasonable notice of the claims or defenses of the other, and is afforded a fair opportunity to controvert them. If the pleadings do not give the information necessary to enable the adverse party to intelligently concert his reply, then he is entitled to a bill of particulars giving such information, and it is error to refuse it.

[16, 17] The declaration in the instant case notifies the defendant that the plaintiff has sixty acres of land planted in "bulbs" which the defendant has destroyed by flooding his lands. But there are many kinds of bulbs of different values and productiveness. The defendant was entitled to information as to the quantity and kind of bulbs the plaintiff was suing for. He asked for this information and it was denied him. In the brief of his counsel it is said:

"The failure to file a bill of particulars was not due to contumacy or neglect, but to the inherent inability to make any fuller disclosure than had already been made

in the declaration. The trial court recognized this and declined to compel a restatement of what had already been declared." Yet, in the same brief, we find an itemized statement of what the plaintiff proved on the trial, which furnishes the very information which could and should have been furnished by a bill of particulars. The statement is as follows:

"The plaintiff proved losses as follows:

*On Narcissus:*

| | | | |
|---|---|---|---|
| Bulbs planted and destroyed | 50,000 | | |
| Probable yield | 100,000 | | |
| Value of crop | | $2,000.00 | |
| Less cost of maturing and marketing | | 75.00 | |
| Loss | | | $1,925,00 |

*On Gladioli:*

| | | | |
|---|---|---|---|
| Bulbs planted and destroyed | 50,000 | | |
| Probable yield | 75,000 | | |
| Value of crop (bulbs) | | $1,687.50 | |
| Less cost of maturing and marketing | | 162.50 | |
| Loss | | | 1,525.00 |
| Blooms killed | 50,000 | | |
| Value a $50 per 1,000 | | $2,500.00 | |
| Less cost of maturing and marketing | | 1,000.00 | |
| Loss | | $1,50.000 | |

*On Dahlias:*

| | | | |
|---|---|---|---|
| Bulbs planted and destroyed | 10,350 | | |
| Probable yield | 41,400 | | |
| Value of crop | | $4,000.00 | |
| Less cost of maturing and marketing | | 340.00 | |
| Loss | | | 3,660.00 |
| Total Loss | | | $8,610.00" |

We see no reason why this information could not have been furnished as well before trial as after verdict.

[18] Again, it is said in the brief for defendant in error, "as a matter of fact, in efforts to compromise this case before trial, the city officials were furnished with full data," but the statement is denied by counsel for the city. Even if true, the plaintiff was not bound by such data given before suit was brought. The city was entitled to be informed officially by the pleadings and the proceedings in the case what demand the plaintiff was making upon it. This information was not furnished and for this reason the city is entitled to a new trial.

The giving of plaintiff's instruction B is assigned as error. That instruction was as follows:

"The court instructs the jury that if they find for the plaintiff, the measure of his damages is the value of the crops destroyed by the overflow of July, 1922, in the condition in which they were at the time of their destruction, in so far as they believe from the evidence such overflow was caused by the city of Portsmouth.

"And in arriving at such value it is proper for the jury to determine from the evidence what the probable yield would have been, under proper cultivation, and the value of such probable yield when matured, gathered and ready for sale; and also the cost of maturing, gathering and marketing the crop. But in determining such value, the jury must consider the value of similar crops of others engaged in the same kind of farming in the neighborhood on similar land, under similar cultivation and under similar conditions of maturing, harvesting and marketing.

"The difference between the value so found and the cost of maturing, gathering and marketing so found, may be taken by the jury to represent the value of the crops at the time of loss."

In the latitude of Norfolk county, Virginia, bulbs of the character in controversy may remain in the ground and continue to grow indefinitely, but where such bulbs are raised for market, they are planted annually, and after they mature they are dug, dried and sold. The bulbs in controversy were annual crops. At the time of the flooding the narcissus bulbs had matured but not the others. The time for digging, however, had not yet arrived. The plaintiff generally took his narcissus bulbs up about September 1. His dahlia bulbs in October and his gladiolus bulbs in November.

[19, 20] According to the great weight of authority the true measure of damages for a loss or partial destruction of a growing crop is the value of the crop in the condition it was at the time and place of destruction. But the difficulty is to ascertain that value. In the instant case the trial court directed the jury to consider what would be the probable yield of the crop and the value of that yield at maturity, and to take from it the expense of maturing, harvesting and marketing. This, we take it, was a fair way of estimating the value of the crop at the time of its destruction. *Tretter* v. *Chicago, etc., R. Co.*, 147 Iowa 375, 126 N. W. 339, 140 Am. St. Rep. 304, and especially note at page 314; 8 R. C. L. 381; 13 Cyc. 153; 17 C. J. 887; Note, 12 L. R. A. (N. S.) 267.

The defendant's instructions five and six need not be quoted. They relate to questions hereinbefore decided adversely to the defendant, and the trial court committed no error in refusing them.

[21] Defendant's instruction 7, relating to the act of limitations, was properly refused because in conflict with *Watts* v. *Southern Railway Company*, 134 Va. 503, 114 S. E. 736.

The trial court modified defendant's instructions 2

and 3, and this is assigned as error.   The modifications made the instructions conform more nearly to the evidence, correctly stated the law, and were not prejudicial to the defendant.

The court also modified defendant's instruction No. 7.   The instruction as given was substantially as asked, except the words in italics, and was as follows:

[22] "The court instructs the jury that if they believe from the evidence that the supposed damages to the plaintiff's bulbs were due to an extraordinary rainfall, then they must find for the defendant.   And that by extraordinary rainfall is not meant such a downpour of rain as may not have been known to occur, but only such rainfall that is so unusual and extraordinary that men of ordinary prudence would not have anticipated and provided for; but *floods such as from climatic and geographical conditions may reasonably be expected, whether of frequent or infrequent occurrences must be taken into* consideration in estimating hazards attending the obstructions of water courses."

The modification correctly states the law and accords with *City of Richmond* v. *Cheatwood,* 130 Va. 76, 107 S. E. 830.

As the case has to be tried again, it is unnecessary to pass on the assignments that the verdict is contrary to the law and the evidence and is excessive.

For the error hereinbefore mentioned, the judgment of the trial court will be reversed, the verdict of the jury set aside, and the case remanded to the trial court for a new trial.

*Reversed.*