# Richmond

ALBERTIS S. HARRISON, JR., ATTORNEY GENERAL OF VIRGINIA v.
SIDNEY C. DAY, JR., COMPTROLLER OF VIRGINIA.

January 19, 1959.

Record No. 4929.

Present, All the Justices.

The opinion states the case.

A. S. Harrison, Jr., Attorney General and R. D. McIlwaine, III, Assistant Attorney General (Kenneth C. Patty, Assistant Attorney General on brief), for the petitioner.

Samuel H. Williams, for the respondent.

EGGLESTON, C. J., delivered the opinion of the court.

■ This is a petition for a writ of mandamus filed in this court by the Attorney General against the Comptroller, pursuant to Code, § 8-714, to determine the validity of a number of related acts of the General Assembly affecting the operation of the public schools throughout the Commonwealth. The proceeding was instituted when the Comptroller, in a letter to the Attorney General, expressed doubt as to the validity of certain provisions in the acts and the regulations of the State Board of Education authorizing the issuance of warrants by the Comptroller to reimburse local school boards for the State's share of disbursements made for the payment of tuition grants, to be expended in furtherance of the elementary and secondary education of Virginia students in nonsectarian private schools. The matter is before us on the pleadings and the exhibits filed therewith, and the issue is whether the statutes involved violate certain provisions of the Constitution of Virginia and the fourteenth amendment to the Federal Constitution.

The several acts involved are summarized in the margin.[1]

---

[1] (1) Act of 1956, Ex. Sess., ch. 68, p. 69 (Code, 1958 Cum. Supp., § 22-188.3 ff.).

Section 1 of the Act declares that if and when the school authorities of the various political subdivisions of the Commonwealth are ordered to enroll white and colored children in the same public schools, such enforced integration of the races "could destroy" the efficiency of the school and "would tend to disturb the peace and tranquility of the community in which such school is located." Code, 1958 Cum. Supp., § 22-188.3.

Section 2 declares that "the welfare of all the citizens of the Commonwealth, the preservation of her public school system and a continuance of universal public education, make it necessary that there be uniformity of action throughout the State in all instances where school authorities acting voluntarily, or under compulsion," enroll white and colored children in the same public school. Code, 1958 Cum. Supp., § 22-188.4.

Section 3 provides that from and after September 29, 1956, the Commonwealth "assumes direct responsibility for the control of any school, elementary or secondary," to which children of both races are assigned and enrolled by any school authorities acting voluntarily or under compulsion of any court order. It further provides that the making of such an assignment and the enrollment of such child or children "shall automatically divest the school authorities making the assignment and the

It will be observed that the stated purpose of the plan embodied in these acts is to prevent the enrollment and instruction of white and colored children in the same public schools. To that end, all elementary and secondary public schools in which both white and colored children are enrolled are, upon the happening of that event, automatically closed, removed from the public school system, and placed under the control of the Governor. All State appropriations for the support and maintenance of such schools are cut off and withheld from them. Such State funds so withheld, and certain other funds raised by local levies, are to be used for the payment of tuition grants for the education in nonsectarian private schools of

---

enrollment of all further authority, power and control over such public school, its principal, teachers and other employees, and all pupils then enrolled or ordered to be enrolled therein; and such school is closed and is removed from the public school system, and such authority, power and control * * * shall be and is hereby vested in the Commonwealth of Virginia to be exercised by the Governor * * *." Code, 1958 Cum. Supp., § 22-188.5.

Sections 4 and 5 specify certain duties of the Governor with respect to a possible reorganization of any school which may be closed and removed from the public school system by operation of the foregoing provisions. Section 6 empowers the Governor to reassign the children in such closed school to any available public schools where such an assignment is practicable. Code, 1958 Cum. Supp., §§ 22-188.6, 22-188.7, 22-188.8.

Section 7 authorizes the Governor and the local school authorities to make tuition grants in limited amounts to those children who cannot be reassigned to other public schools out of funds which would otherwise have been available for the operation of such closed school. Such grants are to be expended for the education of such children in nonsectarian private schools. Code, 1958 Cum. Supp., § 22-188.9.

Section 9 and Section 10 (as amended by Acts of 1958, ch. 631, p. 939) prescribe the conditions under which the control of an affected school may be restored to the public school system and its operation, control and maintenance returned to the local school board. Code, 1958 Cum. Supp., §§ 22-188.11, 22-188.12.

(2) Act of 1956, Ex. Sess., ch. 69, p. 72 (Code, 1958 Cum. Supp., § 22-188.30 ff.). This Act is a corollary to the Act of 1956, Ex. Sess., ch. 68, p. 69, *supra*, and requires the establishment by the State of an efficient system of elementary and secondary public schools in any school division in which such a system is not operated under local authority, provided "the local governing body" adopts a resolution stating such condition and declaring the need for such State operated system. Code, 1958 Cum. Supp., § 22-188.30.

Section 2 of the Act declares that "an efficient system" of elementary and secondary public schools "means and shall be only that system within each county, city or town in which" no elementary or secondary school "consists of a student body in which white and colored children are taught." Code, 1958 Cum. Supp., § 22-188.31.

Under Sections 5 and 6, such "State established public free school system shall be administered by the Governor for the General Assembly" under the supervision of the State Board of Education. Code, 1958 Cum. Supp., §§ 22-188.34, 22-188.35.

According to Section 4 such State system shall use and be housed in the "unused

children who have been attending such public schools, who cannot be assigned to other public schools, and whose parents or custodians desire that they do not attend schools in which both white and colored children are enrolled and taught. Schools which may be policed under federal authority, or disturbed by such policing, are, upon the happening of that event, likewise automatically closed, and, under related statutes, tuition grants are made available for pupils who have been attending such schools.

The immediate question presented is whether the plan meets the requirements of the Constitution of Virginia.

---

school buildings and related facilities" owned and maintained by the local school boards. (Code, 1958 Cum. Supp., § 22-188.33.) Under Section 11 such schools are to be financed in part out of levies to be made by the localities, paid into the State treasury, and expended by the State Board of Education in such localities. Code, 1958 Cum. Supp., § 22-188.40.

(3) Act of 1958, ch. 642, p. 967 (not codified). Items 130 to 161, both inclusive, of this, the Appropriation Act, appropriate funds for school purposes, but with certain limitations and conditions thereon embodied in a preamble of eight un-numbered paragraphs (pages 989-990). In the first of these paragraphs there is a legislative declaration and finding of fact that "the mixing of white and colored children in any elementary or secondary public school within any county, city or town of the Commonwealth constitutes a clear and present danger affecting and endangering the health and welfare of the children and citizens residing in such county, city or town, and that no efficient system of elementary and secondary public schools can be maintained in any county, city or town in which white and colored children are taught in any such school located therein."

The second and third paragraphs of the preamble define an "efficient system" of elementary and secondary public schools, respectively, as "only that system within each county, city or town in which" no school "consists of a student body in which white and colored children are taught."

The fourth paragraph of the preamble provides that the General Assembly, for the purpose of protecting the health and welfare of the people and in order to preserve and maintain an efficient system of public elementary and scondary schools, declares it to be the policy of the Commonwealth "that no public elementary or secondary schools in which white and colored children are mixed and taught shall be entitled to or shall receive any funds from the State Treasury for their operation, and, to that end, forbids and prohibits the expenditure of any part of the funds appropriated by Items 137, 138, 141, 142 and 147 of this section for the establishment and maintenance of any system of public elementary or secondary schools, which is not efficient."

These items are for the stated purposes:

Item 137: For the establishment and maintenance of local supervision of instruction in efficient elementary and secondary schools, including visiting teachers, to be apportioned among such schools by the State Board of Education.

Item 138: For basic appropriation for salaries of teachers employed only in efficient elementary and secondary schools.

Item 141: For salary equalization of teachers employed only in efficient elementary and secondary schools.

In his opening brief the Attorney General took the position that the mandatory requirement of Section 129 of the Constitution that "The General Assembly shall establish and maintain an efficient system of public free schools throughout the State," is no longer effective and binding, because, he said, Section 129 is predicated upon the validity of Section 140 which provides that "White and colored children shall not be taught in the same school," and that when Section 140 was invalidated by the decision of the Supreme Court of the United States in *Brown* v. *Board of Education*, 347 U.S. 483, 74 S. Ct. 686, 98 L. ed. 873, this "necessarily entailed the simultaneous emasculation of Section 129 and its extirpation from the organic law of the Commonwealth."

---

Item 142: For providing a minimum educational program in efficient elementary and secondary schools only.

Item 147: For pupil transportation to and from efficient elementary and secondary schools only.

The eighth and final paragraph of the preamble permits all State funds withheld under these provisions to be used for (1) the payment of salaries and wages of "unemployed teachers in State aid teaching positions, and other public school employees, who are under contract;" and (2) "for educational purposes which may be expended in furtherance of elementary and secondary education of Virginia students in nonsectarian private schools, as may be provided by law."

(4) Act of 1956, Ex. Sess., ch. 56, p. 56 (Code, 1958 Cum. Supp., § 22-115.19, note), makes available to localities funds to be expended for the payment of tuition grants. Under its terms such grants are payable out of the funds appropriated to the localities but withheld from them under the provisions of the Appropriation Act of 1956 (Acts 1956, ch. 716, pp. 1074, 1096).

Section 3 of the later Act authorizes the State Board of Education to promulgate rules and regulations for the payment of such grants.

(5) The Act of 1956, Ex. Sess., ch. 57, p. 57 (Code, 1958 Cum. Supp., § 22-115.1 ff.), authorizes any locality wherein no levy or appropriation is made for the operation of public schools, to provide for a limited levy and collection of taxes to be expended by the school board in payment of tuition grants for the furtherance of the elementary or secondary education of children of such locality in nonsectarian private schools. Such educational funds are to be expended by the local school boards in payment of such grants.

(6) The Act of 1956, Ex. Sess., ch. 58, p. 59 (Code, 1958 Cum. Supp., § 22-115.10 ff.), establishes the procedure by which various localities are required under specified conditions to make tuition grants to qualified pupils attending nonsectarian private schools. Section 2 requires the local authorities to include in their school levy or appropriation sufficient amounts to provide for the payment of tuition grants. Code, 1958 Cum. Supp., § 22-115.11.

Under Section 3 such funds shall be expended by the local school board in payment of grants for the furtherance of the elementary or secondary education of the children of such county, city or town in nonsectarian private schools to parents or custodians of children who have been assigned to, or are in attendance at, public schools wherein both white and colored children are enrolled. In order to secure such grants the parents or custodians must make affidavit that they object to the

When it was argued in the brief of the respondent that the statutory plan also violates the provisions of Sections 130, 133, 135 and 136, Article IX, of the Constitution, the Attorney General amended his position and contended in his reply brief and in his oral argument before us, that all of the other provisions in Article IX dealing with "Education and Public Instruction," like Section 129, are predicated upon the right of the Commonwealth, as embodied in Section 140, to operate segregated public free schools, and that when Section 140 fell under the axe of the *Brown* case, all of the provisions in Article IX became inoperative. He thus summarized his position:

---

assignment of such children to, or their attendance upon, such mixed schools. Code, 1958 Cum. Supp., § 22-115.12.

Under Section 4 the total amount of each such annual grant, together with any tuition grant received from the State, shall not exceed the total cost of operation per pupil in average daily attendance in the public schools of the locality making such grant as determined for the preceding school year by the Superintendent of Public Instruction. Code, 1958 Cum. Supp., § 22-115.13.

Under Section 7 local school boards may promulgate rules and regulations, not inconsistent with those of the State Board of Education, to carry out the purpose of the Act. Code, 1958 Cum. Supp., § 22-115.16.

Section 10 provides that whenever a locality fails and refuses to make such grants the State Board of Education shall authorize and direct the Superintendent of Public Instruction to provide for the payment of such grants from funds appropriated by the State for distribution to that locality. Code, 1958 Cum. Supp., § 22-115.19.

(7) The Act of 1956, Ex. Sess., ch. 62, p. 62 (Code, 1958 Cum. Supp., § 22-115.20), authorizes local school boards to expend for tuition grants school funds designated for public school purposes without first obtaining the authority therefor from the local tax levying bodies.

(8) Act of 1958, ch. 41, p. 26 (Code, 1958 Cum. Supp., § 22-188.41 *ff.*).

Section 2 of the Act provides that whenever, except upon application of the General Assembly, or the Governor, any military forces or other federal personnel shall enter upon the premises of any public school, or in the vicinity thereof, for the purpose of policing its operation, or to prevent acts of violence, or alleged acts of violence, "the school shall thereupon automatically be closed and its operation suspended." Code, 1958 Cum. Supp., § 22-188.42.

By the terms of Sections 3 and 4 the Governor is directed to "assume all control and exercise all authority" with respect to such school, its operating personnel and pupils, and the powers and duties of the local authorities are automatically suspended. Provision is made for the payment of tuition grants by the local authorities to the children in such closed school who cannot be reassigned to other public schools. Code, 1958 Cum. Supp., §§ 22-188.43, 22-188.44.

Section 5 specifies the conditions upon which such school may be reopened and its control returned to the local authorities. Code, 1958 Cum. Supp., § 22-188.45.

(9) The Act of 1958, ch. 319, p. 367 (Code, 1958 Cum. Supp., § 22-188.46 *ff.*), authorizes the Governer to close additional schools in any school division wherein a school has been closed under the provisions of Chapter 41 of the Acts of 1958,

"In light of what has been said, it is manifest that racially integrated public schools and schools comprising an inefficient system are beyond the scope of Article IX of the Virginia Constitution and are not comprehended by any of the provisions of that Article. This is so, not because schools of this character were unknown and given no consideration by the framers of the Virginia Constitution, but because such schools *were* considered by the framers, were found to be fundamentally objectionable, and were consequently excluded from the ambit of Article IX entirely. It follows that no racially integrated public schools and no schools comprising a system deemed to be inefficient by the General Assembly can find any warrant for existence or possess any standing whatever under the Virginia Constitution."

In short, the Attorney General says, the General Assembly now has plenary power to deal with the public free school system in any manner it may deem fit, unfettered by any requirements of, or limitations in, the Constitution of Virginia.

The provisions of the Constitution do not permit the matter to be so summarily disposed of. In the first place, there is no word or suggestion in any provision in Article IX, or elsewhere in the Constitution, that these provisions which were incorporated in the Constitution along with Section 140 are conditioned upon the validity of that section. It would have been a simple matter to have qualified the mandate of Section 129 by stating that the obligation to establish and maintain an efficient system of public free schools was expressly conditioned upon the segregation of children of the two races, or to have so defined an "efficient system." Similarly, by appropriate language, the other provisions in Article IX could have been expressly conditioned upon the validity and operation of Section 140. This was not done.

In the next place, there is nothing in the Debates of the Constitutional Convention to indicate that the framers intended that Section 140 was to have this effect. Article VIII, § 3, of the Con-

---

*supra,* and to assume full control thereof. It divests the local authorities of their powers and duties with respect to such school. As in the preceding Act (Acts 1958, ch. 41, *supra*), provision is made for the payment of tuition grants by the local authorities for children who have been attending the closed school and cannot be reassigned to other public schools. Code, 1958 Cum. Supp., §§ 22-188.46, 22-188.47, 22-188.48.

The closing paragraph of the Act specifies the conditions upon which such closed school may be reopened and its operation restored to the local authorities. Code, 1958 Cum. Supp., § 22-188.49.

stitution of 1869 had provided for the establishment of a public free school system in this language: "The general assembly shall provide by law, at its first session under this constitution, a uniform system of public free schools, and for its gradual, equal and full introduction into all the counties of the state, by the year 1876, or as much earlier as practicable." In the Convention of 1901-02 there was considerable debate in reframing this provision in the language of Section 129 of the present Constitution. Likewise, there was considerable discussion of what are now Section 130, dealing with the function of the State Board of Education, and Sections 133, 135 and 136 dealing with the local administration of schools, the State appropriations for school purposes, and the levying and expending of local school taxes. There is nothing in the debates on these sections to indicate that their validity or operation was to be conditioned upon the validity of Section 140.

It is true that the framers of the Constitution of 1902 intended that white and colored children should not be taught in the same public schools. That is the plain purpose and intent of Section 140. They had been assured by *Plessy* v. *Ferguson*, 163 U. S. 537, 16 S. Ct. 1138, 41 L. ed. 256, decided in 1896, just five years before the members of the Convention assembled, that this was permissible under the Fourteenth Amendment. The Debates of the Convention also show that Section 140 was adopted without discussion.[2] It is extremely unlikely that this would have been accomplished had the framers intended, as the Attorney General argues, that all of the provisions in the Constitution dealing with educational matters were predicated upon the validity of Section 140.

In considering other provisions relating to educational matters there was discussion as to whether some of the members of the General Assembly, in carrying out the mandate of the Constitution of 1869 for the establishment of a system of public free schools, favored mixed schools.[3] But beyond this, the subject of mixed or segregated schools was not discussed.

Moreover, if it be "manifest," as the Attorney General contends, that all of the provisions in Article IX with respect to public education became inoperative when the decision in the *Brown* case struck down Section 140 of the Constitution, surely that view would have been presented to this court when we had under consideration in

---

[2] Debates of Constitutional Convention (1902), p. 1237.
[3] Debates of Constitutional Convention (1902), p. 1086 *ff.*

*Almond* v. *Day*, 197 Va. 419, 89 S. E. 2d 851 (decided in 1955 after the decision in the *Brown* case), the power of the General Assembly under Section 141, as it then read, to appropriate funds for the education of war orphans in private schools.

Furthermore, why then was it necessary that a constitutional convention be held in 1956 to amend Section 141 so as to authorize the appropriation of funds for the education of Virginia students in nonsectarian private schools? If the Attorney General be correct in his position, the General Assembly, at that time, had plenary power to deal with the public school system as it saw fit and no constitutional authority by amendment to Section 141 was necessary.

 It is earnestly contended by the Attorney General that the meaning, intent and purpose of Section 129 of the Constitution should be ascertained by resort to extrinsic evidence, especially with regard to the circumstances surrounding its adoption. This is contrary to the general principle that construction of a constitutional provision is required only when the language is ambiguous or obscure in meaning. 4 Mich. Jur., Constitutional Law, § 18, p. 101 *ff.*

The language of Section 129 is clear and positive in its terms and provisions. Its meaning and intent are found in the language of the section itself; language so simple and positive as to require no resort to extrinsic evidence.

We are not permitted to speculate on what the framers of that section might have meant to say, but are, of necessity, controlled by what they did say. There being no doubtful or ambiguous words or terms used, we are limited to the language of the section itself and are not at liberty to search for meaning, intent or purpose beyond the instrument. And where, as here, the intent is expressed in clear and unmistakable language, we cannot be influenced by whether we deem the provision to be wise, expedient, or desirable. *Almond* v. *Gilmer*, 188 Va. 1, 29, 49 S. E. 2d 431, 446.

 We hold that Section 140 and the other sections in Article IX, including Section 129, dealing with public education, are independent and separable, and that the destruction of Section 140 by the decision in the *Brown* case did not strike down the other provisions in Article IX. If it be desirable that all of the provisions dealing with the public school system be stricken from the Constitution, it should be done by proper amendments to the Constitution in the manner therein provided. It should not be done by judicial construction. The aim of judicial construction, and also its

limitation, is to determine the meaning of what has been written, not to delete sections from the Constitution on the theory that if conditions had been different they would not have been written.

Our view that Sections 129 and 140 of the Virginia Constitution are independent and separable is supported by the recent holding of the Supreme Court of North Carolina in *Constantian* v. *Anson County*, 244 N. C. 221, 93 S. E. 2d 163. That case involved the similar question whether the invalidation by the decision in the *Brown* case of the provision in the North Carolina constitution requiring that white and colored children be taught in separate public schools, also invalidated the constitutional provision requiring the general assembly to provide for a system of public schools. Both of these provisions are incorporated in section 2 of article IX of that constitution.

The court pointed out that the first sentence of this section, providing for the establishment of a system of public schools, was ratified in 1868, and the second, providing for the segregation of the races, was added by an amendment adopted by the Constitutional Convention of 1875. It concluded that the decision in the *Brown* case had affected these constitutional provisions to this extent:

"* * * Only that portion of the 1875 amendment which purports to make *mandatory* the *enforced* separation of the races in the public schools is now held violative of the equal protection clause of the Fourteenth Amendment to the Constitution of the United States. Otherwise, the mandates of Article IX, sections 2 and 3, remain in full force and effect. The provisions thereof, absent the mandatory requirement of enforced separation, are complete in themselves and capable of enforcement. Their separable and independnt status is manifest. They antedate the 1875 amendment. They survive the invalidation of the mandatory requirement of enforced separation contained in the 1875 amendment." (93 S. E. 2d, at page 168.)

While Section 129 of the Virginia Constitution requiring the General Assembly to "establish and maintain an efficient system of public free schools throughout the State" is still in the organic law and must be complied with, that section should be read in connection with Section 141 as amended by the Convention of 1956. The material portion of Section 141, as amended, reads:

"No appropriation of public funds shall be made to any school or institution of learning not owned or exclusively controlled by the State or some political subdivision thereof; provided, first, that

the General Assembly may, and the governing bodies of the several counties, cities and towns may, subject to such limitations as may be imposed by the General Assembly, appropriate funds for educational purposes which may be expended in furtherance of elementary, secondary, collegiate or graduate education of Virginia students in public and nonsectarian private schools and institutions of learning, in addition to those owned or exclusively controlled by the State or any such county, city or town; * * *."

It will be observed that under Section 141, as amended, the General Assembly has permissive authority to appropriate funds for the education of Virginia students in nonsectarian private schools. The language is that it "may" appropriate funds for that purpose. On the other hand, Section 129 imposes a mandatory duty on the General Assembly to establish and maintain an efficient system of public free schools throughout the State. The language of Section 129 is that it "shall", that is, it *must*, appropriate funds for the latter purpose. *Board of Supervisors* v. *Cox*, 155 Va. 687, 707, 156 S. E. 755; *School Board* v. *Shockley*, 160 Va. 405, 412, 168 S. E. 419.

Clearly, the language of Section 141, as amended, contemplates that if State funds are to be devoted to the education of Virginia students in nonsectarian private schools, the General Assembly should make the necessary appropriation therefor. The purposes of Section 141 may not be accomplished at the expense of some public free schools by withholding State funds from their support, and devoting such funds to the payment of tuition grants, as is attempted under the provisions of the Appropriation Act of 1958. (Acts 1958, ch. 642, p. 989.)

This device leaves such schools from which the supporting funds are withheld and diverted entirely without the State support required by Section 129 of the Constitution. That section requires the State to "*maintain* an efficient system of public free schools *throughout the State.*" (Emphasis added.) That means that the State must support such public free schools in the State as are necessary to an efficient system, including those in which the pupils of both races are compelled to be enrolled and taught together, however unfortunate that situation may be.

It follows, then, that the provisions of the Act of 1956, Ex. Sess., ch. 68, p. 69 (Code, 1958 Cum. Supp., § 22-188.3 *ff*.), and the provisions of the Appropriation Act of 1958, ch. 642, p. 989, violate Section 129 of the Constitution in that they remove from the public

school system any schools in which pupils of the two races are mixed, and make no provision for their support and maintenance as a part of the system.

It is argued that the closing of schools under these provisions is merely temporary. But the acts do not so provide, and the fact that provision is attempted to be made for the education in private schools of children who have been attending these interrupted schools indicates that the condition may be prolonged. Indeed, it is a matter of common knowledge that under the provisions of these acts a number of schools in several localities in the State have been closed for months.

As an alternative to his main contention that Section 129 is no longer binding on the General Assembly, the Attorney General argues that the provisions of the Act of 1956, Ex. Sess., ch. 68, p. 69 (Code, 1958 Cum. Supp., § 22-188.3 ff.), and the provisions of the Appropriation Act of 1958 (Acts 1958, ch. 642, p. 989), just discussed, do not violate Section 129. Here, his argument runs thus: While Section 129 requires the maintenance of an "efficient system" of public schools it does not define the term, but leaves that to the determination of the General Assembly; that body has said that such a system means "only that system within each county, city or town" in which no elementary or secondary school "consists of a student body in which white and colored children are taught."[4] and hence the plan satisfies the constitutional requirement.

We agree that the General Assembly may determine what is an "efficient system," but it cannot by definition impair or disregard constitutional requirements. It is elementary that unless the context suggests otherwise, words in the Constitution are to be given their usual plain or ordinary meaning. 4 Mich. Jur., Constitutional Law, § 9, p. 96. Applying this principle, it is clear that the word "efficient," as used in Section 129, embraces other factors beyond those in the statutory definition. Among such other factors are a sufficient number of schools with adequate buildings and equipment, a sufficient number of competent teachers, and other basic matters associated with the public school system. While the mixing of the races is a factor which may impair the efficiency of the system, the separation of the races alone will not, as the statutory definition implies, constitute an "efficient system."

[4] Acts of 1958, ch. 642, at page 989; Acts of 1956, Ex. Sess., ch. 69, § 2, at page 73; Code, 1958 Cum. Supp., § 22-188.31.

■ Again, the Act of 1956, Ex. Sess., ch. 68, p. 69 (Code, 1958 Cum. Supp., § 22-188.3 *ff.*), providing for the closing of schools because of integration, divesting local authorities of all power and control over them, and vesting such authority in the Governor, violates Section 133 of the Constitution which vests the supervision of local schools in the local school boards. *School Board* v. *Shockley*, *supra*, 160 Va., at page 409.

Similarly, the Act of 1956, Ex. Sess., ch. 69, p. 72 (Code, 1958 Cum. Supp., § 22-188.30 *ff.*), providing for the establishment and operation of a State school system to be administered by the Governor and under the supervision of the State Board of Education, violates Section 133.

Section 11 of this Act (Code, 1958 Cum. Supp., § 22-188.40) directs that local levies authorized under the Act be paid into the State treasury to be expended by the State Board of Education in such localities. This runs counter to Section 136 of the Constitution which requires that local school taxes be expended by the "local school authorities."

■ The Act of 1958, ch. 41, p. 26 (Code, 1958 Cum. Supp., § 22-188.41 *ff.*), and the Act of 1958, ch. 319, p. 367 (Code, 1958 Cum. Supp., § 22-188.46 *ff.*), provide for the closing of schools in communities which may be disturbed because of the presence in, and policing of, such schools by federal troops and personnel. Under the provisions of these chapters such schools are automatically closed. When a school is closed under these provisions all authority over it is taken from the local school authorities and vested in the Governor. (Code, 1958 Cum. Supp., §§ 22-188.43, 22-188.44, 22-188.47, 22-188.48.) While we agree that the State, under its police power, has the right under these conditions to direct the temporary closing of a school, the provision divesting the local authorities of their control and vesting such authority in the Governor runs counter to Section 133 of the Constitution.

■ We find no constitutional objection to the prescribed procedure for making tuition grants out of funds properly available for the purpose.[5] Section 141 of the Constitution, as amended, authorizing State and local appropriations for this purpose places no

---

[5] See the following acts, summarized in footnote 1, *supra*: Acts of 1956, Ex. Sess., ch. 56, p. 56 (Code, 1958 Cum. Supp., § 22-115.19, note; *Id.*, ch. 57, p. 57 (Code, 1958 Cum. Supp., § 22-115.1 *ff.*); *Id.*, ch. 58, p. 59 (Code, 1958 Cum. Supp., § 22-115.10 *ff.*); *Id.*, ch. 62, p. 62 (Code, 1958 Cum. Supp., § 22-115.20).

restriction on the manner in which this is to be done, thus leaving it to the discretion of the General Assembly.

Having reached the conclusion that certain provisions of the acts with which we are concerned violate the provisions of the Constitution of Virginia in the several respects stated, it is not necessary that we consider the question whether these acts likewise violate the provisions of the fourteenth amendment to the Federal Constitution as interpreted by the recent decisions of the Supreme Court of the United States in *Brown* v. *Board of Education, supra,* 347 U. S. 483, 74 S. Ct. 686, 98 L. ed. 873, and *Cooper* v. *Aaron,* 358 U. S. 1, 78 S. Ct. 1401, 3 L. ed. 2d 5.

There is no occasion for us to discuss these decisions other than to say that we deplore the lack of judicial restraint evinced by that court in trespassing on the sovereign rights of this Commonwealth reserved to it in the Constitution of the United States. It was an understandable effort to diminish the evils expected from the decision in the *Brown* case that prompted the enactment of the statutes now under review.

Since the warrants proposed to be drawn by the Comptroller are payable out of State funds which have been improperly withheld from certain public free schools in the State, under the provisions of the Appropriation Act of 1958 (Acts 1958, ch. 642, p. 967) and the Act of 1956, Ex. Sess., ch. 68, p. 69 (Code, 1958 Cum. Supp., § 22-188.3 *ff.*), and since there are no other State funds available for the purpose, the writ prayed for is denied.

*Writ denied.*

MILLER and SNEAD, JJ., dissenting.

MILLER, J., dissenting:

The ultimate legal question presented in this case is whether or not certain enactments of the General Assembly of Virginia enumerated and summarized in the majority opinion, which authorize the making of tuition grants under specific circumstances therein stated, violate the State or the Federal Constitution. Under these enactments the occurrence of certain enumerated events over which the General Assembly can exercise no control but deemed by it to be wholly incompatible with the maintenance of an *efficient* system of

public free schools, causes funds otherwise appropriated for the operation of public schools within the affected area to become available for tuition grants to pupils irrespective of race who elect to attend non-sectarian private schools.

I agree with that part of the majority opinion that recognizes the authority and constitutional right of the General Assembly under § 141 of the Constitution of Virginia, as amended in 1956, to provide by appropriate legislation for the expenditure of public funds for the payment of tuition grants for the education of Virginia pupils in non-sectarian private schools. In fact, the State's power to appropriate funds for the payment of such grants *per se* is not in issue; both litigants agree that the General Assembly has that authority. I, however, disagree with that part of the opinion which holds that § 129 of the Virginia Constitution is still effective and operative and that the several challenged acts are violative of that section, and as a result denies to the Comptroller the right to make payment of such tuition grants. The validity of the acts that authorize tuition grants depends, in my judgment, upon whether the mandate of § 129 was suspended and rendered inoperative by the decision of the Supreme Court of the United States in *Brown* v. *Board of Education*, 347 U. S. 483, 74 S. Ct. 686, 98 L. ed. 873, which suspended the operative effect of § 140 of the Virginia Constitution.

My conclusion is that when the decision rendered § 140 inoperative, it necessarily rendered § 129 inoperative. I am convinced that § 129 was intended by the Constitutional Convention that adopted it to be dependent upon the *effective* operation of § 140. Thus my fundamental disagreement with the majority opinion is that it does not accord to § 129 the manifest intent and purpose of the Constitutional Convention which adopted it simultaneously with the plain mandate embodied in § 140. Holding § 129 to be operative gives to the decision of *Brown* v. *Board of Education, supra,* the effect of imposing an *affirmative* mandate upon the General Assembly of Virginia to operate a system of public free schools though that system be inefficient. The majority opinion makes of § 129, along with §§ 133, 135, and 136 of Article IX, an instrument by which the General Assembly is required to do what § 140, simultaneously adopted, forbade it to do in clear and positive language.

It is elementary that the right and authority to interpret and construe our constitutional provisions rests with us. Our construction is final and not subject to review. In order to arrive at the proper

construction we should ascertain the purpose and object sought to be attained by the framers of the Constitution so as to make effective the intent of the people who adopted it.

Section 129 is the initial provision of Article IX relating to education and public instruction. It ordains that:

"The General Assembly shall establish and maintain an efficient system of public free schools throughout the State."

The framers did not intend to impose upon the General Assembly the duty and obligation to maintain a system of public free schools without more. Section 129 specifically imposed the duty to maintain *an efficient system*. That is the only character of school system that the General Assembly was required to maintain. It was the only system it could thereafter lawfully maintain; that and none other. What constituted an efficient system of public free schools was left to the wisdom of that body except in the one particular that was then and there, with the same breath, embodied into the basic law of the Commonwealth. Section 140 of the same Constitution declared that:

"White and colored children shall not be taught in the same school."

These two sections, one imposing a positive duty, the other prohibiting a power, were contemporaneous, adopted simultaneously. Section 140 was intended by the framers to prohibit a system that would be inefficient *per se*. All other sections of Article IX deal with the financial, operative and administrative means, functions and procedure by which an efficient system might be maintained. When read together, as they must be, §§ 129 and 140 have the following effect: (a) impose upon the General Assembly the obligation to maintain an efficient system of public free schools, and (b) deny to the General Assembly the right to maintain integrated schools.

Then what was the effect upon § 129 when § 140 was rendered inoperative by a superior power as distinguished from being repealed by the usual process to accomplish that result? The admonition of Justice Gregory, speaking in *Board of Supervisors* v. *Cox*, 155 Va. 687, 704, 156 S. E. 755, is illuminating.

"No single section of the Constitution should be construed alone, but consideration given to the instrument as a whole, and, so far as possible, all provisions harmonized.

\* \* \* \* \* \* \*

"An elementary rule of construction is that all related provisions of a constitution or statutes must be considered and read together in construing one provision. * * *" (At page 707)

The answer to the question whether the Constitutional Convention intended that § 129 be operative though § 140 be rendered inoperative by a superior power may be found by resort to history, to prior legislative acts disclosing the public policy of Virginia and to the Debates in the Constitutional Convention that adopted these fundamental provisions. However, before that is done, it is well to recognize the underlying motivation for the adoption of a Constitution by a sovereign state, the office of such basic and fundamental law, and the accepted and recognized rules for its interpretation. Their recital will reveal their pertinency to the inquiry in hand. They have been recently stated by this court in *Dean, et al.* v. *Paolicelli, et al.,* 194 Va. 219, 226, 72 S. E. 2d 506.

"The office and purpose of the constitution is to shape and fix the limits of governmental activity. It thus proclaims, safeguards and preserves in basic form the pre-existing laws, rights, *mores*, habits and modes of thought and life of the people as developed under the common law and as existing at the time of its adoption to the extent as therein stated. *Commonwealth* v. *Newport News*, 158 Va. 521, 164 S. E. 689; *Virginia, etc., R. Co.* v. *Clower*, 102 Va. 867, 47 S. E. 1003.

"Its interpretation and construction are to be made with recognition of the fact that it is based upon and announces the fundamental theory and principles of sovereignty and government as developed under the common law. 4 Michie's Jurisprudence, Constitutional Law, sec. 7, p. 94; *Commonwealth* v. *Newport News, supra.*

"The constitution must be viewed and construed as a whole, and every section, phrase and word given effect and harmonized if possible. *Barbour* v. *Grimsley*, 107 Va. 814, 61 S. E. 1135; *Portsmouth* v. *Weiss*, 145 Va. 94, 133 S. E. 781; *Funkhouser* v. *Spahr*, 102 Va. 306, 46 S. E. 378; *Board of Sup'rs* v. *Cox*, 155 Va. 687, 156 S. E. 755.

"Purpose, meaning and force must be accorded both of these sections of the constitution and to all of their provisions unless they be irreconcilably contradictory and repugnant. *State* v. *Harden*, 62 W. Va. 313, 58 S. E. 715, 60 S. E. 394; *Board of Sup'rs* v. *Cox, supra.*

"The purpose and object sought to be attained by the framers of the constitution is to be looked for, and the will and intent of the

people who ratified it is to be made effective. *May* v. *Topping*, 65 W. Va. 656, 64 S. E. 848."

Principles to be observed in constitutional construction are thus stated in 11 Am. Jur., Constitutional Law, §§ 61, 63:

"The fundamental principle of constitutional construction is to give effect to the intent of the framers of the organic law and of the people adopting it. * * *

"It has been very appropriately stated that the polestar in the construction of Constitutions is the intention of the makers and adopters.

"Wherever the purpose of the framers of a Constitution is clearly expressed, it will be followed by the courts. Even where terms of a constitutional provision are not entirely free from doubt, they must be interpreted as nearly as possible in consonance with the objects and purposes in contemplation at the time of their adoption, because in construing a constitutional provision, its general scope and object should be considered.

\* \* \* \* \* \* \*

"It is settled by very high authority that in placing a construction on a Constitution or any clause or part thereof, a court should look to the history of the times and examine the state of things existing when the Constitution was framed and adopted, in order to ascertain the prior law, the mischief, and the remedy. A constitutional provision must be presumed to have been framed and adopted in the light and understanding of prior and existing laws and with reference to them. *Constitutions, like statutes, are properly to be expounded in the light of conditions existing at the time of their adoption, the general spirit of the times, and the prevailing sentiments among the people.* * * *

"Construction based on custom, usage, or the conclusions of the courts must be properly subordinated to the time factor of the creation of the Constitution itself, and later usages cannot override a patent intention expressed at an earlier date. Thus, neither statutes enacted nor judicial opinions rendered since the adoption of a Constitution can impute a different meaning to it than that obviously intended at the time the Constituton was adopted." (Emphasis added.) 16 C. J. S., Constitutional Law, § 30, p. 101; *Almond* v. *Day*, 197 Va. 782, 91 S. E. 2d 660.

Though § 140 has been rendered inoperative, it has not been repealed; it bespeaks the public policy of Virginia at the time of its adoption and it proclaims the basic ideas and desires of the people of this day.

" 'The Constitution is not to be construed in a technical manner, but in ascertaining its meaning we are to consider the circumstances attending its adoption, and what appears to have been the understanding of the people when they adopted it,' and we then only announced a rule of interpretation which had been frequently adopted." *Bonsal* v. *Yellott, et al.*, 100 Md. 481, 60 A. 593. *State* v. *Donald*, 160 Wis. 21, 151 N. W. 331.

Section 140 was compatible with the Federal Constitution when adopted.[1] This compatibility was confirmed many years later.[2] For more than fifty years this compatibility was unquestioned. The Federal Constitution had been authoritatively construed to sanction the prohibition of this section. Now that § 140 has been rendered inoperative by a superior power, can § 129 operate as a mandate to the General Assembly to establish a school system forbidden by § 140?

The Constitution of 1869, commonly called the Underwood Constitution, required the State to maintain a system of public free schools, but was silent upon the subject whether the races should be separated. This is understandable. The public policy of the Commonwealth was in eclipse. The obvious reason is temperately, yet forcefully, stated in respondent's brief.

"* * * It is well established that the convention of 1869 was largely composed of non-Virginians and of freedmen. * * *" The avoidance of the terms "scalawag" and "carpetbagger" is to be commended.

Yet the General Assembly under this mandate, in the exercise of wisdom, even in the shadows, immediately declared the public policy of Virginia on July 11, 1870, by legislation forbidding the mixing of the races in public schools. This provision, Acts 1869-1870, ch. 259, p. 413, is as follows:

"* * * [P]rovided, that white and colored persons shall not be taught in the same school, but in separate schools, under the same general regulations as to management, usefulness and efficiency; * * *"

It is common knowledge that the able and independent Consti-

---

[1] *Plessy* v. *Ferguson*, 163 U. S. 537, 16 S. Ct. 1138, 41 L. ed 256 (1896).

[2] *Gong Lum* v. *Rice*, 275 U. S. 78, 48 S. Ct. 91, 72 L. ed 172 (1927).

tutional Convention of 1901-1902 was not of like mind with the Convention of 1869 when it undertook to provide for the establishment of an efficient public free school system in Virginia. The eclipse had passed. The native public policy had supplanted the alien. This accounts for the absence in one Constitution of the requirement of racial separation and its presence in the other.

I do not agree with the majority opinion in finding nothing in the Debates of the Constitutional Convention of 1901-1902 to indicate that the mandate of § 129 was to be dependent upon the effective operation of § 140. It should be borne in mind that § 129 required the maintenance of an *efficient* public school system while Article VIII, § 3, Constitution of 1869, imposed no such obligation. In the Debates of 1901-1902 it is obvious that the establishment of an *efficient* system was the Convention's purpose. It is equally plain that separation of the races in the schools was deemed a necessary and indispensable condition for attaining that object.

In presenting to the Convention the report of the Committee on Education, Dr. Richard McIlwaine, chairman of that committee, discussed Article IX before the individual sections were given consideration by the Convention sitting as a committee of the whole. With respect to the report the chairman declared:

"Its execution is finally committed to the General Assembly. It it an efficient system of public free schools that we are trying to obtain. Of course, the *fundamental law on this subject lies at the basis of efficiency*, but we must trust the efficient execution of an efficient law to those who have the carrying out of these principles and their enactment." (Emphasis added.) 1 Debates of the Constitutional Convention of Virginia (1901-1902), p. 1051.

With respect to § 140 he observed:

"The next section is entirely new, and I suppose that there will be very few, if any, who will dissent from it:

"White and colored children shall not be taught in the same school."

This prophetic announcement proved wholly true, for when the provision was called for independent consideration by the chairman of the Convention, it was adopted without discussion or dissent.

Despite the absence of discussion on § 140, which its ultimate unanimous adoption convincingly discloses was due to the unanimity of opinion as to its significance, value and necessity, discussion of § 129 reveals the critical view of the delegates toward the failure

of the alien Convention of 1869 to adopt a similar provision. A forceful criticism, with an observation of the significance of such failure, was thus expressed by Carter Glass:

"Mr. Chairman, I wish to call the attention of the delegate from Montgomery to one point. Perhaps it is not a valuable occupation of time to do it, but he has been glorifying the Underwood Constitution and objecting to the first clause of our report here upon the ground that the Republican party established the free school system in Virginia.

"I wish to call his attention to the fact that the first system proposed by the Republicans under the Underwood Constitution was one that would have absolutely made it impossible to have had any public schools in the State of Virginia, because it contemplated that there should be mixed schools; that negroes and white people should be taught together, and they refused to establish 'public schools at first because that was not done." 1 Debates of the Constitutional Convention of Virginia, 1901-1902, p. 1086, *et seq.*

The majority opinion points out that the mandate of § 129 is not qualified by a statement in the Constitution that the operative effect of that section is conditioned upon the validity of § 140 and that provisions of Article IX could have been expressly conditioned upon the validity and operation of § 140.

Little comfort, if any, can be obtained from the fact that § 129 and other provisions of Article IX are not qualified by or expressly conditioned upon the validity and operation of § 140. First, the Constitutional Convention had the right to believe, and undoubtedly did believe, that § 140 was valid and operative, and would so remain. There was no need or object to be accomplished by making such a statement. Second, though the mandate embodied in § 129 is not expressly conditioned upon the operative effect of § 140, yet when well recognized principles of constitutional interpretation and construction are observed and adhered to, it is plain that such operative effect was necessarily intended by the framers of these two sections.

"In ascertaining both the intent and general purpose, as well as the meaning, of a constitution or a part thereof, it should be construed as a whole. As far as possible, each provision should be construed so as to harmonize with all the others, with a view to giving effect to each and every provision in so far as it shall be consistent with a

construction of the instrument as a whole." 16 C. J. S., Constitutional Law, § 23.

"In view of the rule, discussed supra § 14, that the meaning of a constitution is fixed when it is adopted, the construction given it must be uniform, so that the operation of the instrument will be inflexible, *operating at all times alike, and in the same manner with respect to the same subject; and this is true even though the circumstances may have so changed as to make a different rule seem desirable, since the will of the people as expressed in the organic law is subject to change only in the manner prescribed by them.* \* \* \*" (Emphasis added.) 16 C. J. S., Constitutional Law, § 37.

Correct principles of constitutional interpretation and construction avoid a result that (a) brings provisions of a constitution into conflict, or (b) make of the constitution a shifting and uncertain instrument. The majority opinion, by enforcing the mandate of § 129 without regard to the prohibition simultaneously embodied in § 140, ignores and neglects to apply these fundamental principles. It thus brings provisions of the Constitution into direct conflict and imposes upon § 129 a different operative effect from what it had or could have had when adopted.

The habits and customs, the sentiment and established public policy of Virginia, obtaining for ninety years or more, point to the inevitable conclusion that it was the intent of the framers of § 129 that its mandate upon the General Assembly to maintain an efficient system of public free schools was to be dependent upon the protective and indispensable prohibition of § 140.

In the majority opinion it is stated:

"We agree that the General Assembly may determine what is an 'efficient system,' but it cannot by definition impair or disregard constitutional requirements. It is elementary that unless the context suggests otherwise, words in the Constitution are to be given their usual plain or ordinary meaning. 4 Mich. Jur., Constitutional Law, § 9, p. 96. Applying this principle, it is clear that the word 'efficient,' as used in Section 129, embraces other factors beyond those in the statutory definition. Among such other factors are a sufficient number of schools with adequate buildings and equipment, a sufficient number of competent teachers, and other basic matters associated with the public school system. While the mixing of the races is a factor which may impair the efficiency of the system, the separation

of the races alone will not, as the statutory definition implies, make it an 'efficient system.' "

I am in accord with all of the foregoing paragraph except the last sentence. In fact, I heartily agree that a "sufficient number of schools with adequate buildings and equipment" and sufficient competent teachers are not only factors embraced within the concept of an efficient school system, but they are *indispensable* factors. Lacking either one or any other *necessary* factor, the system cannot be efficient. But be that as it may, the Constitutional Convention deemed separation of the races to be so indispensable to an efficient system that it embodied that provision into the organic law, and the General Assembly has also determined and declared that integrated schools, or schools patroled by and subject to the discipline of federal troops are not and cannot be efficient. Unless the judgment of the legislative branch in that respect is arbitrary, capricious, unreasonable and without foundation, the judicial branch is not authorized to substitute its judgment, whatever it may be, to supplant the finding and declaration of the General Assembly in that respect.

In view of the fact that § 129 no longer imposes any duty upon the General Assembly to maintain public free schools, the provisions of all other sections of the Constitution having to do with such schools, they being predicated upon the obligation imposed by § 129, now inoperative, to establish and maintain an *efficient* system or none at all, necessarily become inoperative. They become inoperative because the mandate of § 129 has become inoperative.

This leaves the General Assembly possessed of plenary and unfettered powers, drawn from its inherent reservoir of sovereignty, to do as it pleases with reference to public schools in this State.

"As the state legislature is the supreme law-making body within the state, it can enact any law not prohibited by state or federal constitution * * *

\* \* \* \* \* \* \*

"The power of the state legislature is an attribute of sovereignty and its power would be absolute if there were no constitutional limitations. * * *" 4 M. J., Constitutional Law, § 31, pp. 114, 115.

"* * * The Constitution is not a grant of power, but only the restriction of powers otherwise practically unlimited and except so as restrained by the Constitution of this State and the Constitution of the United States, the legislature has plenary power. * * *"

*Newport News* v. *Elizabeth City County*, 189 Va. 825, 831, 55 S. E. 2d 56.

"It is an elementary principle of constitutional law that the General Assembly has plenary power except so far as restrained by the Constitution of this State and the Constitution of the United States. It is only where an act is plainly repugnant to some constitutional provision that the courts can declare it null and void. * * *" *Almond* v. *Day*, 199 Va. 1, 6, 97 S. E. 2d 824.

In the absence of operative provisions of the Virginia Constitution restricting the power of the General Assembly with respect to public schools, the General Assembly is now fully empowered to enact any legislation it may please with respect to such schools provided that legislation is general in nature. No such limiting provisions have been pointed out, and we have found none.

This unrestricted power enables the General Assembly to provide by general law for the closing of public free schools upon the happening of such events as the General Assembly may provide and for the payment of tuition grants,—provided always grants are available to pupils irrespective of their race. The grants for which the General Assembly has provided in the Acts of 1956 and 1958 are available alike and under identical circumstances to white and colored pupils.

The majority opinion refrained from determining whether the questioned acts violate the Fourteenth Amendment to the Federal Constitution, thus an expression of opinion on that question would be inappropriate in this dissent.

SNEAD, J., joins in this dissent.