Leola Pearl **BECKETT**, etc., et al.,
Plaintiffs,

v.

**SCHOOL BOARD OF the CITY OF NOR-
FOLK, VIRGINIA et al.,** Defendants.

Civ. A. No. 2214.

United States District Court
E. D. Virginia,
Norfolk Division.

Oct. 22, 1959.

**460**

Victor J. Ashe, J. Hugo Madison, Joseph A. Jordan, Jr., Norfolk, Va., Oliver W. Hill, Spottswood W. Robinson, III, Richmond, Va., for plaintiffs.

Leonard H. Davis, City Atty., W. R. C. Cocke, Leigh D. Williams, Norfolk, Va., A. B. Scott, Richmond, Va., A. S. Harrison, Jr., Atty. Gen. of Virginia, for defendants.

HOFFMAN, District Judge.

Having considered the pleadings herein, with particular reference to the answer filed by Andrew A. Farley, Beverley H. Randolph, Jr., and Hugh V. White, members of and constituting the Pupil Placement Board of the Commonwealth of Virginia, and having heard and considered the testimony given at the hearing held on October 22, 1959, with respect to the applications of Patricia Anzella Turner, Reginald A. Young, Daphne Perminter and Anita Mayer, all of whom are Negro children, for admission to certain public schools in the City of Norfolk, Virginia, for the 1959–60 school session, the Court, supplementing the findings of fact and conclusions of law set forth in its memorandum dated September 8, 1959, now makes the following additional

Findings of Fact.

1. The Pupil Placement Board, existing pursuant to the provisions of §§ 22–232.1 through 22–232.17 of the Code of Virginia, 1950, as amended, pursues the policy of routinely granting all applications of white children for placement in schools attended solely or predominantly by white children, and all applications of Negro children for placement in schools attended solely or predominantly by Negro children, when the granting of such applications is recommended by local school authorities, and of routinely denying all applications of such children when local school authorities either recommend that such applications be denied or do not recommend that such applications be granted. The action of the Pupil Placement Board has accorded this policy in all but three or four instances in the past, since the effective date of the Pupil Placement Act on December 29, 1956.

2. The Pupil Placement Board pursues the policy of routinely denying all applications of Negro children for placement in schools attended solely or predominantly by white children, whether or not recommended by local school authorities, and of placing all Negro children in schools attended solely by Negro children, unless and until a written protest is filed and a hearing is held in accordance with the provisions of § 22–232.8 of the Code of Virginia of 1950, as amended, and no reason other than the applicant's race is assigned or can be found for initially denying the application, and the applicant carries the burden of demonstrating to the satisfaction of the Pupil Placement Board that the placement sought would serve the best interest of the applicant. The action of the Pupil Placement Board has accorded this policy in all instances in the past.

3. The announced policy of the Pupil Placement Board is to routinely deny all applications of white children for placement in schools attended solely or predominantly by Negro children, whether

or not recommended by local school authorities, and of placing all white children in schools attended solely or predominantly by white children, unless and until a written protest is filed and a hearing is held in accordance with the provisions of § 22–232.8 of the Code of Virginia of 1950, as amended, and no reason other than the applicant's race is assigned or can be found for initially denying the application, and the applicant carries the burden of demonstrating to the satisfaction of the Pupil Placement Board that the placement sought would serve the best interest of the applicant.

4. The Pupil Placement Board has pursued these policies in placing more than 450,000 children in the public schools in Virginia with the result that no Negro child has ever been placed by the Pupil Placement Board in a school attended solely or predominantly by white children, nor has any white child ever been placed by the Pupil Placement Board in any school attended solely or predominantly by Negro children.

5. The policies of the Pupil Placement Board respecting Negro children applying for placement in schools solely or predominantly attended by white children, and white children applying for placement in schools attended solely or predominantly by Negro children, necessarily impose upon such applicants requirements and burdens not imposed upon other children seeking transfers or initial enrollment within the school system, and subject such applicants to the application of standards and criteria and to scrutiny by the Pupil Placement Board not applied or given to other children under like conditions.

6. The members of the Pupil Placement Board subscribe to the belief that the overwhelming majority of white and Negro parents and children desire racial segregation in the public schools and that racially segregated public schools serve the best interests and general welfare of all children. One member of the Pupil Placement Board testified that he could not conceive of any circumstances which would cause him to vote in favor of granting the application of a Negro child for placement in a school attended solely or predominantly by white children. The remaining members of said Pupil Placement Board have so qualified their statements that only a "perfect child" under "perfect conditions" could be approved for assignment or enrollment in a school attended solely or predominantly by children of the opposite race.

7. No reason is shown for the Pupil Placement Board's denial of the applications of Patricia Anzella Turner, Reginald A. Young, Daphne Perminter and Anita Mayer other than the fact that they are Negroes, and the aforesaid policies of the Pupil Placement Board and its individual members.

From the foregoing facts the Court states its further

### Conclusions of Law.

1. The policy of the Pupil Placement Board respecting Negro children seeking placement in schools attended solely or predominantly by white children, and its action in assigning Patricia Anzella Turner, Reginald A. Young, Daphne Perminter and Anita Mayer to schools attended solely by Negro children, deny them their rights without due process of law and the equal protection of the laws secured by Section 1 of the Fourteenth Amendment of the Constitution of the United States.

2. The provisions of § 22–232.8 of the Code of Virginia of 1950, as amended, viewed in the light of the current policies and past practices of the Pupil Placement Board, the attitude of its members as to Negro children protesting segregated placements, the failure of the Pupil Placement Board to notify two applicants here involved of denial of their applications, and the further failure to take action upon or otherwise notify the remaining two applicants of the denial of their applications until three days prior to the opening of the school term, and the amount of time essential to satisfaction of the requirements and to exhaustion of the procedures respecting the hearing prescribed,

did not afford these children an administrative remedy adequate to secure their constitutional rights to admission for the 1959–60 school session to the schools to which they applied, and do not legally justify the denial of their applications by the Pupil Placement Board.

■ 3. So long as the Pupil Placement Board pursues its present policies and practices respecting Negro children applying for placement in schools solely or predominantly attended by white children, or white children applying for placement in schools attended solely or predominantly by Negro children, neither the School Board nor the Division Superintendent of Schools of the City of Norfolk, Virginia, is legally required to engage in any procedure involving the Pupil Placement Board, or legally justified in carrying out any action the Pupil Placement Board may take in denying such application. This conclusion of law shall remain in effect, unless otherwise modified or reversed by appellate proceedings, until such time as the Pupil Placement Board in good faith assures the Court that its present policies and practices as aforesaid have been permanently revised to comply with constitutional requirements in the administration of the Pupil Placement Act.

## Comment.

The foregoing findings of fact and conclusions of law emphatically demonstrate the unconstitutional application of a law which is constitutional on its face. The Pupil Placement Act, as amended, aided by the repeal of Virginia's "massive resistance" laws and the decisions in Harrison v. Day, 200 Va. 439, 106 S.E.2d 636, and James v. Almond, D.C., 170 F. Supp. 331, lend support to the view that the Act is constitutional on its face. Nevertheless, an act so construed may soon become unconstitutional in its application, thereby destroying the effect of the statute.

■ The policies and practices of the Pupil Placement Board in initially considering the application of a child seeking transfer or initial enrollment in a public school are not only manifestly unconstitutional under the Constitution of the United States, but are also in plain derogation of the Virginia statute prescribing the factors to be considered by the Board in making such placements and enrollments. § 22–232.5, Code of Virginia, 1950, as amended. The Board candidly admits that the race of the child is the controlling factor wherever a child of one race seeks admission to a school solely or predominantly attended by children of the opposite race. Without exception, the Board states that white children are and will be initially assigned to schools solely or predominantly attended by white children, and Negro children are and will be initially assigned to schools solely or predominantly attended by Negro children, and this is true even though the local School Board may see fit to otherwise recommend. All other factors are disregarded by the Pupil Placement Board.

But, says the Pupil Placement Board, if a child desires to protest our initial action within 15 days, we will accord the child and his parents the benefit of a hearing in accordance with § 22–232.8 of the Code of Virginia, 1950, as amended. The time element required by statute as a prerequisite for such hearing apparently does not disturb the Board—it is a matter of little consequence that the school term will be well under way before any final decision is reached. Finally, it may be said that the present members of the Board are unanimous in their view that only the "perfect child" under "perfect conditions" could possibly be admitted by the Board to a school where the children then in attendance are solely or predominantly of a different race. Indeed, as one member expressed it, the "perfect child" has not yet been born.

Thus, the melody of massive resistance lingers on. To require and expect local school boards to adhere to their constitutional duties under the oath of their office would be futile when the exclusive power of placement and enrollments vests in this Pupil Placement Board. The School Board of the City of Norfolk,

having endeavored since August, 1958, to meet the grave problem of racial mixing in public schools in the face of adversity, and having had remarkable success in such efforts, should no longer be hampered by a statute constitutional on its face, but unconstitutionally applied, wherein the Board admittedly has no intention of performing its duties in a constitutional manner.